[No. B120305. Second Dist., Div. Three. June 22, 1998.]

ANDREA L., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Real Party in Interest.

1378

## COUNSEL

Kenneth A. Krekorian for Petitioner.

No appearance for Respondent.

De Witt W. Clinton, County Counsel, Auxiliary Legal Services, Jill Regal and Amy N. Carter for Real Party in Interest.

## OPINION

**KLEIN, P. J.**—Petitioner Andrea L. (mother) seeks writ review (Welf. & Inst. Code, § 366.26, subd. (*l*); Cal. Rules of Court, rule 39.1B)[1] of respondent court's order terminating family reunification services as to minors Chavonne F. (born May 8, 1983), Larry F. (born May 3, 1985), and Joshua F. (born Dec. 16, 1992), and setting the matter for a hearing under section 366.26 on July 10, 1998. We deny the writ.

[1]Subsequent unspecified statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Jurisdictional basis, disposition and placement of the minors.*

The minors were declared wards of the court pursuant to section 300 based on an amended petition which, as sustained with respect to mother, alleged mother left the minors with maternal great-grandmother on July 31, 1996, without making provisions for the minors' care; mother has inflicted trauma on the minors by punishing them excessively with a belt causing unreasonable pain and suffering; mother has a history of drug abuse which renders mother periodically incapable of providing regular care for the minors; the minors have been left without adequate supervision or food for up to three days at a time; and, the minors have been exposed to violent altercations between mother and father, and between mother and mother's male companion that endanger the minors' physical and emotional safety.[2]

The application for petition dated August 21, 1996, prepared by the Department of Children and Family Services (DCFS), indicated family members advised the children's social worker (CSW) that mother had a history of drug abuse. The application noted mother previously had been the recipient of DCFS services in 1988 when another minor, Davionne, had been removed from mother's custody due to mother's drug abuse. Mother also received DCFS services in 1992 and 1996.

The CSW's report on the initial case plan indicated mother essentially admitted the allegations of the petition as sustained in an interview conducted October 16, 1996. Mother also admitted a child born to mother approximately seven or eight years earlier had been taken from mother at birth based on a positive toxicological screen. Mother admitted she had been imprisoned for selling drugs. A paternal aunt told the CSW mother recently had been seen at a "drug house." Mother's CII (California Identification Index) clearance indicated mother is a registered substance abuse offender with arrests for vandalism, receiving stolen property, battery and annoying phone calls and convictions of disorderly conduct, prostitution, petty theft, and transportation or sale of a controlled substance.

Chavonne told the CSW she had lived with mother and father from birth to the age of four years and lived with maternal grandmother from the age of four years until the age of twelve years. Chavonne thereafter lived with mother until she was taken into protective custody in this matter in July of 1996 at the age of 13 years. Chavonne reported she wanted to reside with maternal grandmother who also had legal guardianship through the probate court of Chavonne's 15-year-old sibling, Shawnte A.

---

[2] The minors' father is not a party to this writ proceeding.

Larry told the CSW he had resided with paternal grandparents from birth until approximately one year ago when he was returned to mother. Larry lived with mother for approximately one year before he was taken into protective custody in this case at the age of eleven years.

The juvenile court originally ordered all three minors detained in the home of a paternal aunt. However, Joshua had to be replaced in foster care in November of 1996 when the paternal aunt reported Joshua was "running in the street and not following the paternal aunt's instruction." In June of 1997, Chavonne's conflicts with paternal aunt's children became disruptive and beyond the paternal aunt's control. Chavonne was placed in foster care but was ordered placed in the home of maternal grandmother in September of 1997. Maternal grandmother promised to refrain from corporal punishment of Chavonne and completed a six-week parenting skills class. However, in January of 1998, Chavonne was placed in foster care after DCFS filed a section 387 petition which alleged maternal grandmother had physically and verbally abused Chavonne.

2. *Mother's compliance with the case plan.*

On February 11, 1997, the juvenile court ordered mother to submit to individual counseling, parenting class, domestic abuse counseling, conjoint counseling with Chavonne and Larry when appropriate, and drug counseling including random drug testing.

In April of 1997, mother claimed she had enrolled in a drug program, but the CSW could not verify mother's participation. Mother also claimed she had enrolled in parenting classes, but admitted she had not enrolled in domestic violence class or individual counseling. Mother's visitation of the minors was sporadic. On July 11, 1997, mother told the CSW, "I can't afford domestic violence! I don't know why I have to do all this stuff. All I did was leave them at my mom's and she turned them in. Why do I have to do all this crap?" After the CSW reported mother's whereabouts had been unknown, the CSW located mother on August 11, 1997, at the county jail.

A case plan update prepared for February 10, 1998, indicated mother had been released from custody on September 27, 1997, and had enrolled in parenting class, drug counseling and individual counseling at Toberman Settlement House and would graduate in March of 1998. Mother commenced random drug testing at Unilab. The Unilab duty worker advised the CSW that mother's test results of November 6, 12 and 25, 1997, and January 15, 1998, had been negative. However, mother failed to test on October 27, November 17, December 1, 16, 24, and 31, 1997, and January 7 and 19,

1998. Attached to the report was a letter dated October 30, 1997, from Sandra Burdick-Nabors of Toberman Settlement House which indicated mother had enrolled in the "Domestic Violence, Drugs/Alcohol and Parenting counseling" programs on October 15, 1997, and that mother was attending weekly counseling sessions for various personal problems. Other documents attached to the letter indicated mother had attended approximately 12 meetings in each of her 3 programs between October of 1997 and January of 1998. Mother told the CSW she wanted Joshua and Chavonne to live with her but that mother would accede to Larry's request to remain with paternal aunt. Larry told the CSW he wished to be adopted by paternal aunt.

On February 10, 1998, the juvenile court ordered mother and Larry to participate in conjoint counseling. The matter was continued to March 13, 1998, for permanency planning hearing.

The family assessment update in the CSW's report prepared for the permanency planning hearing indicated that although the CSW previously reported mother had tested negative on January 15, 1998, upon receipt of copies of mother's Unilab test results, the CSW found mother had tested positive for cocaine metabolite on that date. Mother tested negative on January 27, February 5, 11 and 20, 1998. A progress report from Toberman Settlement House dated March 3, 1998, indicated mother had made "great changes in her decision making skills, communication skills and [had] a much more positive outlook . . . ." However, based on mother's positive test result, mother had been reinstated for an additional four months "to make sure that this situation remains isolated and that we solve the initial problem which has caused [mother] to relapse."

Although mother's visitation of Joshua had improved, the CSW recommended termination of family reunification services, adoption of Larry and Joshua, and long-term foster care for Chavonne.

3. *The permanency planning hearing.*

At the outset of the permanency planning hearing on March 13, 1998, the juvenile court noted mother had tested positive for cocaine. "She is now apparently back in counseling and testing. However as we are at the [section 366].22 date, the recommendation [is] that we terminate family reunification services . . . ." Counsel for mother indicated mother disagreed with the recommendation and requested a contested hearing. The juvenile court asked for an offer of proof. Mother's counsel responded mother would testify that, except for the one positive test result, "mother has been in complete and total compliance with the case plan, including a full program. Her testing before

that and after that has been negative. She continues to test. She is now employed." Counsel noted mother had been visiting Joshua frequently and had "developed a very significant bond" with Chavonne. "And so except for that one test, the mother is ready, willing and able to care for the child Joshua and would like to have Chavonne returned to her care." Mother's counsel also noted the conjoint counseling between Larry and mother ordered by the juvenile court at the last hearing had not yet taken place. Counsel expressed doubt that a full assessment of Larry's amenability to adoption could be made without it.

The juvenile court noted Larry was now 13 years of age and had "stated his preferences [for adoption by paternal aunt] pretty clearly."

County counsel indicated the conjoint counseling had been scheduled but had been canceled due to inclement weather and not because of any failure on the part of DCFS. County counsel then argued, "it doesn't matter how many programs mother completed before she relapsed. The relapse takes her back to square one. All the intervention has not been successful, so I don't see that there is a sufficient offer of proof that the children can be safely returned to her care given a dirty test for cocaine in January of this year. [¶] I would ask that we go forward . . . ."

Mother's counsel disputed the characterization of mother's progress as "back to square one" and represented that Sandra Burdick-Nabors of the Toberman Settlement House would testify "you not only look at the relapse, but you look at the quantity and the quality of the relapse. And in this case it was a one-time relapse apparently. [¶] I have a letter dated February 5th in which they indicate that the mother still shows great motivation and that they have apparently confidence in her [ability to] . . . successfully complete their program. And it is the Toberman Settlement House's recommendation that . . . [the] reunification process continue."

The juvenile court responded: "Well, they can recommend all they want. They're not a legal entity, . . . I mean, I'm at [the 18 month] date, counsel. . . . Whether they think it takes her back to square one or not, at this point I am very frustrated. I mean, this mother had been stepping forward. She had been doing what she was supposed to do. She had been testing clean. [¶] Somebody explain to me the lure of cocaine such that a mother will jeopardize being able to have her children back with her . . . . [¶] . . . It's beyond me to understand. [¶] And as far as Larry goes, Larry wants some stability, and he's decided his [paternal] aunt . . . is the one to give it to him. And he's going to be 13, and I give a lot of weight to his desires."

After hearing from counsel for the minors, the juvenile court concluded: "I don't think mother's offer of proof is sufficient, counsel. I'm sorry. I think that one dirty test just shows me that all that counseling, all that work didn't take hold, and maybe now it will. And if it does, then she can file a [petition for modification under section] 388, and we'll certainly consider what we can do for Chavonne and Joshua."

After an unrelated discussion, mother's counsel inquired if the juvenile court were finding counsel's offer of proof insufficient to set the matter for a contested hearing. The juvenile court responded: "[The f]acts are uncontested, counsel, and I just told you in the Court's eye that one dirty cocaine test does put mother back to square one. I've seen the letter [from Toberman Settlement House]. I have heard your argument. What else would you put on other than that?"

Mother's counsel responded Sandra Burdick-Nabors would testify as an expert witness. The juvenile court replied: "She can be an expert all she wants, but there's no grounds for me to grant further [family reunification] services. There just aren't any. So you're going to argue that the children should go back to the mother today, and I [won't] send them back because I just had a dirty test in January."

Mother's counsel then asked for a four-month extension of family reunification services to permit mother to complete the Toberman Settlement House program. The juvenile court refused and noted "mother has had 18 months."

Mother interjected that she had been incarcerated. Counsel clarified mother had been incarcerated for six or seven months in 1997. Mother admitted she had made a mistake in January but asked the juvenile court for "another chance." The juvenile court responded, "the law doesn't give me a whole lot of outs right here, and the 18 months have passed." "Mother had made progress, and then, as she says, made this terrible mistake, but it's a very costly mistake. [¶] If she continues to test clean, continues the Toberman House, she can file a [section] 388 petition, and the Court would certainly consider it. The Court believes at this point because it is the 18-month date and I do not have any extraordinary circumstances . . . that precluded the mother from obeying the orders of the Court[, family reunification services must be terminated]. [¶] Even if the Court were to allow a full hearing . . . , the evidence that would be presented still does not outweigh the concern the Court has for the welfare of these children because of that dirty test and mother's relapse. I just would need much more time, because there's no way I would return these children today, and I need more

time for her clean tests, more time for her, for more letters from Toberman, and she can certainly file those with the [section] 388 [petition]."

The juvenile court terminated family reunification services and set the matter for a hearing under section 366.26 on July 10, 1998.

Mother seeks writ review of the juvenile court's order.

## CONTENTIONS

Mother contends the juvenile court erroneously failed to grant mother a contested permanency planning hearing and should have provided mother further family reunification services.

## DISCUSSION

1. *No reversible error appears in the juvenile court's denial of a contested permanency planning hearing.*

Mother contends the juvenile court's refusal to conduct a contested permanency planning hearing violated mother's right of due process. (*In re Johnny M.* (1991) 229 Cal.App.3d 181, 189-191 [279 Cal.Rptr. 693].)

DCFS responds mother's representation she was ready to care for the minors was insufficient to require an evidentiary hearing because mother failed to complete the case plan, had tested positive for cocaine in January of 1998, had failed to submit drug tests on other occasions, had failed to complete domestic violence counseling, and had failed to rehabilitate after receiving services in 1996, 1992, and 1988. DCFS argues any error in the failure to set a contested hearing was harmless because the CSW's recommendations were supported by substantial factual information and cross-examination of the CSW would not have altered the result. (Cf. *In re Dolly D.* (1995) 41 Cal.App.4th 440, 447 [48 Cal.Rptr.2d 691] [cross-examination would have exposed the lack of factual support for the "highly conclusory" statements in the social worker's report].)

We conclude the denial of a contested permanency planning hearing, on the facts of this case, does not require remand for a contested hearing.

At issue at a permanency planning hearing conducted under section 366.22 is whether return of a dependent minor to the parents' custody would create a substantial risk of detriment to the minor's safety, protection, or physical or emotional well-being and whether reasonable family reunification services have been provided. If the minor is not returned to the parents,

the juvenile court must develop a permanent plan. (§ 366.22, subd. (a).) Although family preservation is the primary objective during the reunification period (§ 202, subd. (a)), upon cessation of reunification efforts, the scale tips away from the parents' interest in maintaining family ties and towards the child's interest in permanence and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].)

"[T]he proceeding terminating [family] reunification services and setting a section 366.26 hearing is generally a party's last opportunity to litigate the issue of parental fitness as it relates to any subsequent termination of parental rights, or to seek the child's return to parental custody." (*In re Matthew C.* (1993) 6 Cal.4th 386, 392 [24 Cal.Rptr.2d 765, 862 P.2d 765].) If there is clear and convincing evidence the child will be adopted, and there has been a previous determination that reunification services should be ended, termination of parental rights at the section 366.26 hearing is relatively automatic. (*Cynthia D. v Superior Court* (1993) 5 Cal.4th 242, 249-250 [19 Cal.Rptr.2d 698, 851 P.2d 1307].) Because of the important parental interests at stake at a permanency planning hearing, *In re Johnny M., supra,* 229 Cal.App.3d at page 191, a case decided by this division, held "denial of a contested hearing on the issue of permanent placement is not permitted."

Thus, under *In re Johnny M.,* the juvenile court's failure to conduct a contested hearing in this case was error. However, *In re Johnny M.* is distinguishable from this case on the issue of prejudice.

The juvenile court in *In re Johnny M.* denied mother a contested permanency planning hearing because it erroneously believed such a hearing already had been conducted. However, the hearing relied upon by the juvenile court had not resulted in termination of family reunification services. Therefore, mother's right to contest the factual predicates required for termination of services remained intact. As a result of the juvenile court's erroneous legal ruling, the mother did not have occasion to make an offer of proof as to the evidence she might have adduced at a contested hearing. Thus, a harmless error analysis could not be undertaken. Although *In re Johnny M.* rejected the assertion mother might never be prejudiced because the minor in that case might never be adopted, and rejected the assertion mother could adduce whatever evidence she had at her disposal at a hearing to terminate parental rights (*In re Johnny M., supra,* 229 Cal.App.3d at p. 191), it did not, and could not on the record presented there, undertake to determine the probability of a different result had a contested hearing been held.

Here, the social reports before the juvenile court demonstrated mother's relapse into cocaine abuse and her failure to test on other dates

around January 15, 1998. These facts were uncontested and mother's counsel did not request an opportunity to cross-examine the author of the reports.[3] Indeed, mother admitted in her statement to the juvenile court that she had made a mistake. Additionally, the juvenile court accepted as true counsel's representation that mother and her counselor would testify mother's relapse had been an isolated incident, the duration and the quality of the relapse had to be considered, mother remained motivated and involved in the Toberman Settlement House program, mother's counselor had confidence in mother's ability to complete the program successfully, and mother's counselor recommended that mother be provided further family reunification services. Although the juvenile court accepted every aspect of mother's offer of proof, it nonetheless concluded the minors could not be returned to mother because her relapse had been too recent.

Thus, the juvenile court did not mistakenly believe mother's right to a contested hearing previously had been satisfied. Rather, it implicitly conceded mother was entitled to contest the sufficiency of the evidence contained in the social reports and to produce evidence on her own behalf. However, after inquiring what proof mother would adduce at such a hearing, the juvenile court concluded mother's showing would be insufficient to warrant either return of the minors to mother or an extension of family reunification services. Because the juvenile court accepted mother's offer of proof as true, and mother did not seek to cross-examine the author of the social studies before the juvenile court, the present record permits us to determine whether mother was prejudiced by the juvenile court's denial of the request for a contested hearing.

On this record, we confidently conclude, beyond a reasonable doubt, no different result would have obtained had mother's request for a contested hearing been granted. Accordingly, even under the most stringent test of prejudice applicable to a denial of due process, remand for a contested hearing would constitute an idle act and the juvenile court's error must be seen as harmless beyond a reasonable doubt. (*In re Laura H.* (1992) 8 Cal.App.4th 1689, 1696 [11 Cal.Rptr.2d 285]; *In re Amy M.* (1991) 232 Cal.App.3d 849, 867-868 [283 Cal.Rptr. 788].)

---

[3]Although written reports prepared by a county welfare department are admissible at a jurisdictional hearing only where the preparer of the report is available for cross-examination (*In re Malinda S.* (1990) 51 Cal.3d 368, 382-383 [272 Cal.Rptr. 787, 795 P.2d 1244]; § 355, subd. (b)(2); Cal. Rules of Court, rule 1450(c)), once jurisdiction over a minor has been established, the admissibility of such reports is no longer conditioned on the availability of the author for cross-examination (see *In re Corey A.* (1991) 227 Cal.App.3d 339, 346-347 [277 Cal.Rptr. 782]; §§ 366.21, subds. (e) & (f), 366.22, subd. (a)).

## 2. *The juvenile court did not abuse its discretion in failing to extend family reunification services beyond the statutory limit.*

Mother contends the juvenile court should have extended family reunification services for an additional four months to permit mother to complete the Toberman Settlement House program. *(In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1797-1799 [42 Cal.Rptr.2d 200]; *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1406-1407 [22 Cal.Rptr.2d 50].) Mother claims she has maintained visitation with her children, and mother's counselor believed an additional four months of services would be sufficient to permit mother to complete the program successfully. Mother concludes an extension of services was warranted in this case.

We disagree.

The Legislature has recognized there must be a limitation on the length of time a child has to wait for a parent to become adequate in order to prevent children from spending their lives in the uncertainty of foster care. *(In re Marilyn H., supra,* 5 Cal.4th at p. 308.) Thus, family reunification services "may be extended up to a maximum time period not to exceed 18 months if it can be shown that the objectives of the service plan can be achieved within the extended time period." (§ 361.5, subd. (a)(2).) The reunification period is expressly not tolled by a parent's absence or incarceration. (§ 361.5, subd. (e)(1).)

A juvenile court may exercise its discretion to extend family reunification services beyond the statutory limit in a special needs case. *(In re Elizabeth R., supra,* 35 Cal.App.4th at pp. 1793-1799; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1213-1214 [31 Cal.Rptr.2d 75]; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777-1778 [8 Cal.Rptr.2d 416]; § 352.) However, in these cases, there were extraordinary circumstances which militated in favor of extension of family reunification services beyond the 18-month limit. These circumstances uniformly involved some external factor which prevented the parent from participating in the case plan. *In re Elizabeth R., supra,* at pages 1790-1792, involved a mother who had worked hard to comply with the case plan but had been hospitalized during a critical stage of the reunification period. In *In re Daniel G., supra,* at page 1216, the family reunification services provided to a mentally disabled parent "in the last 12 months of the reunification stage were virtually nil—a 'disgrace' as the trial court put it." In *In re Dino E., supra,* at page 1777, adequate family reunification services were not provided the parent. *In re Brittany S., supra,* 17 Cal.App.4th at page 1407, relied upon by mother here, involved a case in which an incarcerated parent was not provided reasonable visitation.

■ In this case, mother received reasonable family reunification services. Mother does not contend otherwise. The failure of the case plan was not caused by inadequate services or an external force over which mother had no control, but by mother's relapse into cocaine abuse. The juvenile court reasonably could conclude such a relapse does not constitute the extraordinary circumstances or special needs necessary to support an extension of family reunification services beyond the statutory limit.

Accordingly, the juvenile court committed no error in refusing to extend family reunification services in this case.

### DISPOSITION

The petition is denied.

Croskey, J., and Aldrich, J., concurred.