Filed 5/8/13  R.C. v. Super. Ct. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| R.C.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN FRANCISCO COUNTY,<br><br>        Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Real Party in Interest. | A137894<br><br>(San Francisco County<br>Super. Ct. No. JD11-3076) |

**INTRODUCTION**

R.C. (Mother) seeks writ review of an order terminating reunification services at the conclusion of the 18-month review hearing for her two-and-a-half year old child and the setting of a hearing for a permanent plan for the child.  (Cal. Rules of Court, rule 8.452; Welf. & Inst. Code, § 366.26.)[1]  Mother challenges the findings that reasonable services were provided by respondent San Francisco Human Services Agency (Agency).  Specifically, she argues the Agency did not provide her with the "intensive" individual therapy required in her service plan, but allowed therapy to dwindle to once per month for five months of the reunification period.  She contends that in the absence of reasonable services, the court erred in terminating services at the 18-month review

---

[1] Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code and all rule references are to the California Rules of Court.

1

hearing (held 23 months after the dependency was initiated) and abused its discretion in ignoring the exceptional circumstances of the case warranting continuing the 18-month review to provide more time for a special needs parent to reunify. We shall affirm.

## FACTS AND PROCEDURAL BACKGROUND

### Detention

On March 11, 2011, the Agency filed a petition alleging that the seven-month-old child came under section 300, subdivision (b) as a result of Mother's inability to provide her with adequate care, supervision and protection. The child was detained. The detention report filed by the Agency described the circumstances leading to detention. Mother and the child's father have a relationship characterized by domestic violence. On March 4, 2011, Mother and the child's father began to argue about Mother's level of intoxication. Mother pushed the father on the bed and began to punch him in the face with closed fists. The father reacted by scratching Mother's face and neck. The father called the police, mother was arrested, and an emergency protective order issued. After Mother's incarceration, the Agency met with the child's maternal grandmother to develop a safety plan for the baby's care, while child protective services investigated the referral.

The child was premature and has severe medical problems. She has chronic lung disease. She required daily nebulizer and oxygen treatment. Because of her severe medical and respiratory problems, she was not able to come into contact with sick children or adults. She required supervised visitation where she would not come into contact with numerous individuals.

Before the detention hearing, the social worker met with the maternal grandmother to create a safety plan for her care for the child and for the child's older brother (who was already living with the maternal grandmother) while CPS continued its investigation. A team decision-making meeting was held March 9, 2011, and Mother agreed to meet with the domestic violence specialist from Positive Directions. The social worker referred Mother to Homeless Prenatal Program (HPP) for a substance abuse assessment and to the National Council on Alcoholism and Other Drug Addictions-Bay Area for drug testing. The worker also referred the parents and child to Foster Care Mental Health

2

for counseling, medication evaluation, and therapeutic visits. At the continued detention hearing on March 17, 2011, the child was detained in foster care.

*Jurisdiction/Disposition*

The report prepared for the disposition hearing related that issues around violence and substance abuse have caused the removal of the child from Mother. Upon meeting the social worker, Mother presented as "very depressed." She has a history of mental illness and had been hospitalized for depression. Mother did not admit to any substance abuse. However, she was testing and attending services. She was also in a domestic violence class at the Riley Center. Although the violence between Mother and the father was severe, Mother refused to discuss it at all. The Agency had made referrals for individual therapy and a psychological evaluation and was waiting for Mother to be assigned. Mother was receiving therapeutic visits with the child twice a week at A Better Way. The Agency also had obtained and delivered a Fast Pass to Mother and, when she stated she lost the pass, she was given tokens.

The child remained medically fragile. She required oxygen at night, along with a medication for lung distress. She used Pulmicort for her nebulizer twice daily. She appeared alert and had a good appetite. She was receiving services from Golden Gate Regional Center for gross motor skill delays.

On June 20, 2011, at the conclusion of the combined jurisdiction/disposition hearing, the court declared a dependency for the child and found true the following: "B1—The mother has a substance abuse problem for which she requires assessment and treatment and which impedes her ability to safely parent the child. [¶] . . . [¶] B5—The mother has mental health issues, including psychiatric hospitalizations, for which she requires assessment and treatment and which impede her ability to safely parent the child. [¶] . . . [¶] B9—The child is at risk of physical harm in that the parents have a relationship in which they have engaged in domestic violence with the child present. Further, both the mother and father have sustained injuries during these incidents."

Other allegations regarding the father alone were also sustained. The court struck several other allegations, including Count B6, which had alleged Mother had

3

developmental delays requiring assessment and treatment and which impeded her ability to safely parent the child.

The court found the Agency had made "reasonable efforts" to prevent or eliminate the removal of the child from the home. Services recommended by the Agency and ordered by the court for Mother included: That she undergo "individual counseling/Therapy which addresses Domestic Violence, Trauma, Effective Communication, Self-Esteem and the Effects of Violence on Children"; that she "remain under the care of a qualified mental health professional and comply with the mental health professional's recommendations for psychotherapy and/or prescribed medication"; that she "maintain a clean and safe home for the child[]"; and that she "refrain from substance abuse and participate in services recommended from the substance abuse assessment." The court ordered the father, but not Mother, to "actively participate in a 52-week DV [domestic violence] program."

### Six and 12-Month Reviews

At the six-month review, the Agency reported that Mother was engaged in services, appeared to be maturing, and was working towards completing her requirements to reunify with the child. The Agency reported it intended to move visitation to Mother's home in an effort to advance her progress toward reunification. The social worker reported Mother's home appeared neat and clean and that Mother had worked hard to clean her home in preparation for the child's return. Mother had been working closely and consistently with A Better Way to improve her parenting skills and had visited consistently, demonstrating improved parenting skills.

All Mother's drug tests have been positive for marijuana. Mother had a cannabis card and tested within the limits according to California law. Mother stated she was making efforts to reduce her use and her test levels were initially high, but were down recently.

Mother had been referred to Jane Christmas for psychological testing on March 30, 2011. Mother reported she had completed the testing over the summer, but when the worker contacted Christmas to obtain a copy of the report in October, she

4

learned that Mother had started the testing but never finished it. The worker arranged a follow up appointment with Christmas.

Mother was being seen by Lindsey Ewick, a therapist at Bayview Mental Health for therapeutic services. However Ewick had not responded to the worker's November request for information. Ewick stated she needed to confirm she had a release of information from Mother. As of January 5, 2012, she had not returned the worker's phone calls. There had been no reported instances of domestic violence during the reporting period.

The report expressed the concerns of the child's doctor that she not be exposed to second hand smoke, given her chronic lung disease. Mother reported she did not smoke in the house. According to the child's physical therapist, the child needed more tummy time to start crawling and her fine motor skills were also delayed.

At the March 1, 2012 hearing on the six-month status review, the court found a substantial probability the child would be returned to the physical custody of the parent within six months. It found the Agency had made "reasonable efforts" to aid the parent to overcome the problems leading to the initial removal and continued custody of the child. It also found mother's progress had been "substantial." The court ordered services continued to be provided to Mother and set the 12-month hearing for April 26, 2012.

The court also found the father had made no progress and terminated the supportive services the Agency had been providing.

The status review report for the 12-month hearing recommended an additional six months of services be provided Mother. The report related that in December 2011 and January 2012, Mother was "5150'd due to depression[;] however she was discharged right away." At the time of the report, Mother was on medication. She continued to see Ewick for therapeutic services. Ewick told the worker on April 4, 2012, that she could not provide an update on therapy without first reviewing the consent forms. Ewick did not thereafter provide a progress report.

Mother completed her psychological evaluation with Christmas and "the evaluation indicated the presence of significant mental health problems, for which

5

[Mother] needs intensive support to address." Mother had a dual diagnoses of depression, not otherwise specified; alcohol abuse, and a personality disorder characterized by paranoid and narcissistic traits; and limited cognitive capabilities. Insofar as Mother's ability to care for the child was concerned, Christmas recommended that Mother attend regular alcohol treatment, ongoing anger management, parenting classes, and intensive individual therapy. Mother continued to use and test positive for marijuana. She denied using alcohol or marijuana at the time the report was prepared; however, Christmas found that Mother minimized her alcohol abuse and diagnosed her with alcohol abuse. Mother was receiving twice-a-week visits with the child, in her home, supervised by A Better Way.

At the 12-month review hearing held April 26, 2012, the court found Mother's progress "substantial," ordered an additional six months of reunification services, and set the 18-month review hearing for September 27, 2012.

### 18-Month Review Report

In addition to the information set forth above, the report prepared for the 18-month review related that the early interventionist with the Golden Gate Regional Services expressed concern regarding Mother's smoking habits and reported her home smelled of smoke. Mother admitted she continued to use marijuana, despite expiration of her card. She again claimed to be in the process of quitting. She claimed she had discontinued her alcohol use and her test results showed no record of alcohol abuse. She was continuing individual therapy with Ewick, but the therapy had been reduced to once-a-month sessions. Ewick told the social worker that Mother was no longer benefitting from the weekly sessions and did not have much to talk about. Ewick had worked with Mother for more than a year. The therapist stated it was a joint decision to move to monthly visits and reported that she did not believe it would be therapeutically appropriate to expand visits to more than once a month. Ewick would not elaborate on Mother's therapeutic services, stating that the only release Mother had authorized was to give the worker a record of Mother's attendance. She did inform the worker that Mother was diagnosed with major depressive disorder recurrent in partial remission. She reported Mother was

6

continuing to work on managing her depression and that she was taking her medication regularly.

The Agency was concerned about Mother's relationship with the father, since it appeared Mother was not engaging in protective measures to address the hostile and violent nature of their relationship. In May 2012, the therapeutic visitation worker told the worker that the maternal grandmother had reported she thought that the father might have been at the home during a visit. A service tech responsible for transportation had reported that on one occasion Mother would not allow her in the house during drop off and the service tech thought this behavior was odd. Mother denied this had happened and denied that the father had ever been present during a visit. The social worker met with Mother to discuss this information and made it clear to Mother that the father could not be around when the child is visiting and that his presence created a safety threat for the child. Mother stated that she and the father continued to see each other, but are not in a relationship and that she had no desire to get back together. The worker discussed the police service calls to Mother's residence (five between January and May 2012) and offered a referral to Mother to undergo a domestic violence intake with the Agency's domestic violence specialist, Christine Leon, to address this continued issue. Mother asked if she and the father could just sign something saying they would stay away from each other.

On June 1, 2012, Mother reported the father had tried again to come into the house and she had refused. The worker suggested she call Leon and discuss strategies for dealing with the relationship. The worker also gave Mother the number to Riley Center Crisis Line in the event the father attempted to come to the house again. In a conference call with Mother and Leon, they discussed her ongoing relationship and strategies for being proactive and dealing with the relationship. Leon stated that Mother had previously participated in eight weeks of domestic violence classes and had transitioned to individual therapy to address issues related to domestic violence existing in her relationship with the father. Leon stated that she and Mother had contacted Mother's counsel to obtain a restraining order against the father. On June 18, Mother admitted that

the father might still have a key to the home and that she would put in a request to have the locks changed. A day later, Mother stated she was backing off on requesting the restraining order because she did not want to cause any more drama in her life. She said she had put in the request to change the locks. On July 23, 2012, Mother stated in response to the social worker's inquiry that she did not think it was necessary to change the locks. The worker discussed with Mother the importance of this safety measure for the child. Mother was told the most recent call on the police log was July 13, 2012, and Mother denied the police came out that day. The worker informed Mother that she would no longer be able to have unsupervised visits due to the Agency's concerns about her interaction with the father. She was encouraged to follow through with the various suggestions to change the locks, get a restraining order, follow through with her therapy and with domestic violence services. The Agency referred Mother to another domestic violence program, Casa De Las Madres, for a domestic violence support group. Mother reported that she had completed intake there and would begin a domestic violence group the week of August 27, 2012. She reported she had had her locks changed.

The two-year-old child was reported to be in the 12- to 18-month range in all developmental domains. She had a significant expressive language delay and used approximately 10 words. She failed all developmental milestones for two year olds, except her ability to imitate adults, which she passed. She was not walking yet, but had learned to pull herself up over the last couple of months and was very mobile. The child's breathing condition was getting better, although there were ongoing concerns regarding mother's cigarette and marijuana smoking and the effects on the child's chronic lung disease. Although there was no direct evidence that Mother was smoking in the home, the social worker and another service provider each reported the home had a stale smokiness present during their visits.

The Agency recommended termination of reunification services to Mother and the setting of a section 366.26 selection and implementation hearing to implement a permanent plan.

*Visitation Changes*

In August 2012, a dispute over visitation arose when the Agency, which in July 2012 had exercised its court-authorized discretion to move to unsupervised visits between Mother and the child, required that visits again be supervised. The Agency required supervision upon discovering Mother had continued her volatile relationship with the father, inviting him to her home, resulting in conflict between the pair and police intervention.

A hearing on the visitation dispute was set for August 15, 2012. The attorney for the child filed a declaration in support of an ex parte hearing on the request for a formal order for supervised visits only, stating: "Mother misrepresented her continued involvement with Father to both the Agency and to the Agency's domestic violence specialist. San Francisco Police Department records of calls for service to Mother's home indicate that contrary to Mother's representations, the police have been called to Mother's home on *eight* occasions since January 2012 to separate Mother and Father. By her own declaration, Mother states that she has not sought police assistance but rather that Father has sought police assistance following Mother's visit with Father and dispute or conflict arising during the interaction." (Italics added.) Mother admitted that the father came to her home unannounced and police records reflected calls for service at all different times of the day and on different days of the week. Mother admitted the father had keys to her home and continued to have those keys. Police officers reported they had regular contact with Mother and the father and, on at least one occasion in the previous two months, the officers smelled alcohol on both parents' breath while confronting them about a conflict. Mother had consistently been admonished that her continued relationship with the father would jeopardize reunification.

On August 10, 2012, after the Agency discovered this information and moved to reinstate supervised visits, Mother's attorney requested a restraining order against the father. Mother's declaration stated the father had a "habit of coming by my apartment uninvited and unannounced." She admitted she sometimes let him in, but stated he often refused to leave. She stated that the father had made the calls to the police, falsely stating

9

that she was being violent with him. She stated that he was trying to jeopardize her efforts to reunify with the child and that he had told her so directly. Mother maintained there was no current physical violence between the pair. She also maintained that the father had not been present during any of her unsupervised visits with the child. She admitted she had allowed him into her home and that she had not been "entirely truthful with my social worker about my contact with him." She also admitted the police repeatedly had advised her not to let the father into her home. On August 13, 2012, the court denied the temporary restraining order against the father. On August 15, the court confirmed that Mother's visits were to be supervised by the maternal great grandmother. The Agency was given discretion to move to unsupervised visitation with 24 hours notice to the child's counsel.

### 18-Month Review Hearing Continued

On September 18, 2012, Mother filed a section 388 request to change court order, seeking to return to unsupervised visits with the child, and describing the steps she had taken to follow up with regard to the relationship with the father, including changing her locks, not allowing the father into the home and engaging in domestic violence services. The hearing on the section 388 petition was scheduled and later continued to be combined with the 18-month review hearing that was continued to November 16, 2012. Three days before the review hearing, Mother moved to continue it pursuant to section 352, arguing she was doing very well, that she had not shown any record of alcohol use and her marijuana levels had dropped to zero recently. She had attempted to obtain a restraining order against the father, had attended eight weeks of domestic violence classes and transitioned to individual therapy to address issues related to domestic violence. She maintained that the therapy had been reduced to monthly, despite her need for intensive therapy. Relying on *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, Mother's counsel requested a continuance in order to "clarify the relationship between the parents and allow the mother . . . time to engage in intensive therapy." The court approved a continuance to January 7, 2013.

On January 3, 2013, the child's counsel sought an order that Mother's visits be supervised by the Agency, rather than the maternal grandmother, and that visits be reduced from 11 hours per week (two 5.5 hour visits) to two 3-hour visits per week. Counsel did so after receiving documentary proof on January 2, 2013, that Mother's recent urinalysis tests established that she continued to use alcohol and that she had seven positive results over the preceding two months, one of which indicated use within eight hours of testing. Mother admitted she had resumed drinking because of "stress." Six of the seven positive tests indicated Mother drank at or near the time of her visits with the child. The police made two service calls to Mother's home in November (after Mother had filed the section 388 petition to change the order to unsupervised visits and overnight visits) to address conflicts between Mother and the father. Contrary to Mother's August 2012 statements that she was finished with her violent and unhealthy relationship with the father, she admitted they had been attempting to reconcile. Further, Mother's use of alcohol was particularly troubling, as in the past she had been involved in violent altercations while under the influence of alcohol. Counsel for the child argued that supervision by the child's elderly great grandmother was insufficient to assure Mother had not consumed alcohol before a visit and that the maternal great grandmother was under no duty to report to the court on such matters. On January 4, 2013, the court granted the request to have mother's visits supervised by the Agency, but denied the request for a reduction in duration of the visits. The 18-month review hearing was again continued.

An addendum report filed in advance of the 18-month review hearing set for February 8, 2013, confirmed many details set forth in the child's counsel's request to change mother's supervised visits. Mother admitted she had been drinking, that she had tested positive for alcohol use on seven occasions since October, that she had invited the father to her home to "work on" the relationship, and that police were called on two occasions in November in response to altercations between the couple at Mother's home. Mother informed the worker she was now staying away from the father, that she had changed her phone number and had put in a request to the housing authority to move her

11

residence. She said she had begun participating in weekly domestic violence classes with a local domestic violence support group and with the Riley Center. Mother reported that she had recently resumed weekly therapy with Ewick, after having once monthly therapy for a period of about five months. The therapist informed the worker that Mother was working on domestic violence issues, parenting topics, and managing her depression. The therapist reported Mother had demonstrated progress in that she left the relationship with the father, stayed on her medication and had not had a major depressive episode in some time.

Mother had been referred to HPP for substance abuse at the outset of the dependency. According to the initial assessment, she had been drinking alcohol for 11 years, and had periods of heavy drinking for the last two years. Mother did not start case management with HPP until 2012, and attended regularly for a brief period until July 2012, at which point she began canceling appointments and did not return. Mother was provided with relapse prevention counseling during the monthly meetings and was encouraged to continue going to AA meetings on a regular basis. Mother only participated in AA for a two-month period and was not attending at the date of the report.

### 18-Month Review Hearing

The 18-month review hearing was held on February 8, 2013, some 23 months after the child's initial detention. Social Worker Candace Seagrove was the only witness. The status review report and the addendum were admitted into evidence. Seagrove confirmed the Agency's recommendation to terminate reunification services, despite the Agency's extensive work with Mother to resolve the safety issues giving rise to the dependency. The primary concern was Mother's continued involvement in the volatile relationship with the father. Notwithstanding more than 18 months of services and continued admonitions that the volatile relationship was putting her reunification at risk, Mother admitted she had invited the father to her home and was trying to work on the relationship. The worker testified there had been numerous 911 calls involving disputes between the pair, but conceded she was unaware of any arrests for domestic violence since the March 2011 incident that precipitated the dependency. Seagrove testified that

Mother reported the two would argue and the argument would escalate to either her calling the police to get the father to leave or he would end up calling the police because she was asking him to leave. With respect to the requirement that Mother participate in intensive individual therapy services, Seagrove testified that Mother's therapist was in the best position to implement the recommendations set forth in the psychological evaluation. Mother was referred for weekly individual therapy with Ewick, in which Mother had participated for a substantial amount of time. However, for a period of approximately five months the weekly therapy transitioned to once monthly sessions because, according to the therapist, Mother was not benefitting from the weekly sessions and did not have much to discuss during their therapy sessions. The decision to reduce the frequency of sessions was a joint decision by Mother and the therapist. Seagrove testified that one of the issues addressed in Mother's therapy was domestic violence. The social worker disputed Ewick's view that Mother had made progress in the relationship with the father. The Agency worked with Mother over the course of the dependency to address the domestic violence and social workers had repeatedly explained to Mother that the child could not be exposed to that relationship due to the history of violence and the nature of the violence. They had believed Mother was "on track" to unsupervised overnight visits when everything halted in August due to discovery of Mother's reengagement with the father and her admission that she had not been truthful with the Agency about that relationship. Mother had been receiving domestic violence services from the Riley Center since August 2012, as well as through the Agency's domestic violence specialist. Upon referral by the Agency, Mother had also participated in an eight-week domestic violence group at the beginning of the case.

Seagrove also testified that in addition to the domestic violence issues, the Agency had ongoing concerns about Mother's substance abuse issues, particularly her continuous use of alcohol and her smoking habits. Seagrove related that Mother had recently begun testing positive for alcohol beginning in October 2012, and as recently as January 2013, one month before the 18-month review hearing. Mother never completed a program or committed to AA, even after numerous referrals issued to HPP to assist her in

13

overcoming her substance abuse. Asked why the Agency did not provide alternative services, the social worker explained that Mother was not testing positive for alcohol before her relapse in October 2012, and there was no indication that she needed a more rigid program. Seagrove testified Mother tested positive for marijuana on at least one occasion since September, although her most recent tests had been negative. The worker stated the Agency's concern about Mother's use of alcohol and marijuana to cope with stress and about the impact on Mother's cognitive abilities when she is under the influence of these substances, insofar as her ability to care for this special needs child.

The Agency was also concerned about Mother's smoking cigarettes and her minimizing the importance of her smoking in light of the information provided by the child's doctors and the Agency regarding the detrimental effects her smoking had on the child, whose lung function was already seriously compromised and the referral to HPP to receive support to stop smoking. A pulmonary specialist monitors the child and in light of the child's condition, a smoke-free home is essential "so as not to trigger any kind of asthma conditions relating to the chronic lung disease." Mother indicated she wanted to stop smoking only a few weeks before the 18-month review hearing. The social worker again referred Mother to HPP to assist her with smoking cessation. The social worker opined that in light of the child's multiple medical and developmental needs and appointments, it was extremely important that the child's caretaker be drug free, very organized and very present and aware.

At the end of the hearing, the court terminated reunification services to Mother. It found that Mother had made some effort to comply with reunification requirements, but that she had not reached a point where she could be entrusted to provide the necessary protective measures the child required. The court also rejected Mother's argument that she had not received sufficient therapeutic services, finding "the therapist herself had assessed that mom wasn't benefiting from the therapy sessions, and that they jointly decided that they would go to monthly sessions and that mom didn't have much to talk about and things were just not moving." The court found by clear and convincing evidence that Mother did not and was not able to participate fully in the court-ordered

14

treatment plan, that the Agency had made reasonable efforts to provide or offer services designed to overcome the obstacles leading to the dependency, and that the Agency complied with the case plan by making reasonable efforts to return the child to a safe home. The court further found that return of the child to the parents would create a substantial risk of detriment to the safety, protection, emotional or physical well being of the child. The court set a section 366.26 hearing.

On February 14, 2013, Mother filed a notice of intent to file a writ petition and this petition followed.

## DISCUSSION

Mother challenges the finding that the Agency provided reasonable services and the refusal of the court to find that "extraordinary circumstances" warranted further continuance of the 18-month review in order to provide more time for her to reunify with the child. (§ 352; *In re Elizabeth R., supra,* 35 Cal.App.4th at pp. 1793-1799.)

### I. The Agency Offered Reasonable Services

*Standards of Review*

The court at every review hearing where a child is not returned must find, and in this case did find, that the Agency had provided or offered the parent reasonable services, defined as services designed to aid the parent in overcoming the problems that led to the initial removal and continued custody of the child. (See § 366.21, subd. (e).) The case plan must be appropriate to the individual parent and based on the unique facts of that individual. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) "In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*Id.* at p. 547; accord, *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)

The juvenile court is required to have clear and convincing evidence when it finds the reunification services offered were adequate. However, we review that finding on appeal for substantial evidence. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "The

issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to other appeals. If there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion. [Citation.] The [petitioner] has the burden of showing the finding or order is not supported by substantial evidence. [Citation.]" (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Hence, we review reasonableness of services offered by viewing the evidence in a light most favorable to the finding. So viewed, it is clear that substantial evidence supports the finding that reasonable services were offered by the Agency.

### *Reasonable Services Were Provided*

Services provided by the Agency to Mother here included, but were not limited to: referral for a psychological evaluation; referrals to individual therapy for domestic violence treatment and for her depression; referrals to other domestic violence programs and resources, including an eight-week program at the outset of the dependency; supervised therapeutic visitation; drug testing; passes for public transportation; referrals to a parenting program; and referrals to substance abuse programs.

The heart of Mother's challenge to the reasonableness of services is her claim that the Agency did not provide or insist upon *intensive* individual therapy as recommended by the psychologist, to address the domestic violence concerns. We disagree.

Referral to Ewick for therapy addressed the key concern of the Agency with regard to Mother's volatile relationship with the father and the domestic violence that accompanied that relationship. The record belies Mother's suggestion that "domestic violence services were not a part of her disposition/reunification requirements before" the end of the reunification period. The detention was precipitated by an instance of domestic violence between the parties, leading to Mother's arrest. The jurisdiction findings included a finding that, "[t]he child is at risk of physical harm in that the parents

16

have a relationship in which they have engaged in domestic violence with the child present. Further, both the mother and father have sustained injuries during these incidents." Services recommended by the Agency and ordered by the court for Mother included that she receive "individual counseling/Therapy which addresses Domestic Violence, Trauma, Effective Communication, Self-Esteem and the Effects of Violence on Children," and that she "remain under the care of a qualified mental health professional and comply with the mental health professional's recommendations for psychotherapy and/or prescribed medication." It was understood and reiterated throughout the dependency that domestic violence concerns were being primarily addressed in the individual therapy and through additional referrals by the Agency to entities offering domestic violence support, classes and counseling.

*In re Riva M.* (1991) 235 Cal.App.3d 403, 414, observed, "[i]t is the job of [the Agency] to assist parents with inadequate parenting skills in remedying the sources of the problem, not to eradicate the problem itself." The record should show that the supervising agency identified the problems, offered services designed to remedy them, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult." The Agency did all this and much more.

Mother argues that the reduction in therapy with Ewick from weekly to once a month that occurred in May 2012, and continued for approximately five months until weekly therapy was resumed, did not constitute the intensive therapy recommended by Christmas and required to meet Mother's situation. However, Mother's counsel acknowledged in seeking a change in the visitation order to unsupervised visits that Ewick had decided the monthly visits were therapeutically appropriate. Mother began therapy with Ewick early in the dependency and at the time individual therapy was reduced because Mother was not benefiting, Mother and Ewick had been engaged in individual therapy for over a year. Counsel for Mother also acknowledged that the Agency urged Mother to return to weekly appointments. According to Ewick, goals for Mother's therapy were to work on issues related to domestic violence with the father, to

remain sober, and to discuss things that depress her and how to manage these things. The Agency was in contact with Ewick throughout Mother's treatment with her, although Mother apparently would agree only to release of attendance information to the Agency. Acceding to the judgment of the therapist as to what was therapeutically appropriate at the time and to Mother's wish to reduce the frequency of individual therapy to once a month for five months in the circumstances did not constitute abandonment of Mother by the Agency or abdication of its duty, as Mother suggests. Substantial evidence supports the court's finding that the Agency provided reasonable circumstances in this case.

## II. Extraordinary Circumstances Exception Inapplicable

Nor are we persuaded by Mother's claim that the court should have found exceptional circumstances warranting a continuance of proceedings pursuant to section 352 and provision of services for additional time beyond the 18-month review to allow her to reunify because she is a "special needs parent with 'quite limited cognitive abilities' who 'will need a great deal of help.' " Section 352, subdivision (a) provides in relevant part: "Upon request of counsel . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements."

Because the child was younger than three years of age when she was removed, Mother was statutorily entitled to six months of services. (§ 361.5, subd. (a)(1)(B).) Services were extended to 12 months. At the 12-month review hearing, services may be extended to 18 months from the date of removal where it can be shown the permanent

18

plan is that the child will be returned and safely maintained during the extended period of time. (§ 361.5, subd. (a)(3).)[2]

We reject the claim that the court erred in refusing to find "extraordinary circumstances" or special needs warranting a further continuance beyond the time set for the 18-month review hearing.

Although Mother refers to herself as a "special needs" parent throughout the writ petition, at the jurisdiction and disposition hearing, the juvenile court struck Count B6, which alleged Mother had developmental delays for which she required assessment and treatment. The psychological evaluation of Dr. Christmas found Mother had "limited cognitive capabilities," in addition to "significant mental health problems," requiring "intensive support," depression, alcohol abuse, and a personality disorder. However, there was no judicial finding that she was a special needs parent or that her alleged developmental delays were significant factors in the dependency. Nor had Mother or her counsel characterized her as a special needs parent *before* filing the instant writ petition. The services she received were tailored to her circumstances.

In any event, the extraordinary circumstances required in order to continue services for a longer time under the exception are not present here and the cases upon

---

[2] We note that before the amendment of section 361.5, subdivision (a)(4), in 2008, *absent extraordinary special needs*, the juvenile court's extension of services beyond 18 months was an abuse of discretion and in excess of its jurisdiction. (*Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1509; 10 Witkin, Summary of Cal. Law (2012 Supp.) Parent and Child, § 643, p. 325.) Notwithstanding section 361.5, subdivision (a)(3) [18-month maximum], services may be extended up to a maximum of 24 months after the date the child was originally removed from parental custody, *only* if it is shown at the permanency planning hearing that the child will be returned and safely maintained in the home within the extended time period *and* the court finds it in the child's best interest to have the time period extended and there is a substantial probability the child will be returned to the physical custody of the parent within the extended time period *or* that reasonable services have not been provided to the parent. (§ 361.5, subdivision (a)(4); 10 Witkin, Summary of Cal. Law, *supra,* § 643, p. 325.) Mother does not rely upon this section and we would find no support for its application in this case.

We also note that the court had *already* granted one continuance of the 18-month review hearing at Mother's request pursuant to section 352. The 18-month hearing actually occurred 23 months after the child was removed from her physical custody.

19

which Mother relies for her claim the court erred are distinguishable.  As described in *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388-1389 (*Andrea L.*):

"The Legislature has recognized there must be a limitation on the length of time a child has to wait for a parent to become adequate in order to prevent children from spending their lives in the uncertainty of foster care.  (*In re Marilyn H.* [(1993)] 5 Cal.4th [295,] 308.)  Thus, family reunification services 'may be extended up to a maximum time period not to exceed 18 months if it can be shown that the objectives of the service plan can be achieved within the extended time period.'  (§ 361.5, subd. (a)(2).)  . . . .

"A juvenile court may exercise its discretion to extend family reunification services beyond the statutory limit in a special needs case.  (*In re Elizabeth R.* [(1995)] 35 Cal.App.4th [1774,] 1793-1799; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1213-1214; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777-1778; § 352.)  However, in these cases, there were extraordinary circumstances which militated in favor of extension of family reunification services beyond the 18-month limit.  These circumstances uniformly involved some external factor which prevented the parent from participating in the case plan.  *In re Elizabeth R., supra,* at pages 1790-1792, involved a mother who had worked hard to comply with the case plan but had been hospitalized during a critical stage of the reunification period.  In *In re Daniel G., supra,* at page 1216, the family reunification services provided to a mentally disabled parent 'in the last 12 months of the reunification stage were virtually nil—a "disgrace" as the trial court put it.'  In *In re Dino E., supra,* at page 1777, adequate family reunification services were not provided the parent.  *In re Brittany S., supra*, 17 Cal.App.4th at page 1407, . . . involved a case in which an incarcerated parent was not provided reasonable visitation."  (*Andrea L., supra*, 64 Cal.App.4th at p. 1388.)

*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, also cited by Mother, is also inapposite as the Court of Appeal determined that there was no substantial evidence that reasonable reunification services had been offered to the incarcerated father over the term of the dependency.  (*Id.* at pp. 1016-1018.)

In *Andrea L., supra,* 64 Cal.App.4th 1377, the court determined the mother had received reasonable family reunification services and that the mother's drug relapse did not constitute the extraordinary circumstances or special needs necessary to support such an extension. (*Id.* at pp. 1389.) The court there concluded: "The failure of the case plan was not caused by inadequate services or an external force over which mother had no control, but by mother's relapse into cocaine abuse. The juvenile court reasonably could conclude such a relapse does not constitute the extraordinary circumstances or special needs necessary to support an extension of family reunification services beyond the statutory limit." (*Ibid.*) So, too, in this case the failure of the case plan was not caused by inadequate services or by an external force over which Mother had no control. Rather, Mother's repeated engagement with the father, allowing him in to her home, continuing the conflict with him to the point that the police were called on numerous occasions, lying to the Agency and her social workers about the continuation of her relationship with the father, as well as her lapse from sobriety during the waning weeks of the dependency support the court's refusal to find extraordinary circumstances or special needs supporting extension of family reunification beyond the statutory limit.

## DISPOSITION

The petition is denied on the merits. (*Kowis v. Howard* (1992) 3 Cal.4th 888, 894 [barring later challenge by appeal].) Our stay of the section 366.26 hearing is dissolved. Our decision is immediately final as to this court.

_____
Kline, P.J.

We concur:

_____
Lambden, J.

_____
Richman, J.

21