Filed 1/9/14  In re C.J.CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re C.J., a Person Coming Under the Juvenile Court Law. | B249199 (Los Angeles County Super. Ct. No. CK 78011) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KATHLEEN J. et al., Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marilyn K. Martinez, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant Kathleen J.

Grace Clark, under appointment by the Court of Appeal, for Defendant and Appellant David J.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Stephen D. Watson, Associate County Counsel, for Plaintiff and Respondent.

Kathleen J. (mother) and David J. (father) appeal the juvenile court's order denying parents' request for a contested Welfare and Institutions Code section 366.26 hearing.[1]  Appellants contend their due process rights were violated when the court denied their request to present evidence of the "beneficial parent-child relationship" and "sibling relationship" exceptions to the termination of parental rights after hearing their offers of proof.  (See § 366.26, subd. (c)(1)(B)(i) & (v).)  We reject this challenge, and affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

C.J. was born in July 2011.  A toxicology test result showed C.J. tested positive for marijuana.  Although mother initially denied current substance abuse, she admitted she smoked a little marijuana but "did nothing to put her baby's health into jeopardy." Father, who tested negative for drugs, stated he was unaware of mother's use of marijuana during her pregnancy.

On August 1, 2011, the Los Angeles County Department of Children and Family Services (DCFS) filed a petition on C.J.'s behalf.[2]  The petition, as sustained, alleged the child came within the juvenile court's jurisdiction under section 300, subdivision (b), because mother's use of illicit drugs caused C.J. to be prenatally exposed to marijuana, rendered her incapable of providing care for C.J., and endangered the child's physical health and safety.  The petition further alleged father knew of mother's illicit drug use, failed to protect C.J., and placed her at risk of physical harm and danger.[3]

C.J. was detained and placed in foster care.  For mother, the court ordered monitored visitation of a minimum of three visits per week, three hours per visit.  Father was permitted to have monitored visits except at the location of C.J.'s placement where

---

[1]    Undesignated statutory citations are to the Welfare and Institutions Code.

[2]    Appellants have three minor sons, two of whom were included in the petition.  The three sons are not a part of this appeal.

[3]    The petition additionally alleged the unsanitary home environment established by the parents endangered the child's health and safety and created a detrimental home environment.  However, this allegation was not sustained.

2

his visits could be unmonitored. C.J.'s three older siblings were ordered to have monitored visits with C.J.

During August and September 2011, eight visits were scheduled for C.J. and her parents at the Inner Circle Foster Family Agency.[4] Mother and the siblings were present for all of the scheduled visits. Father was not present for three of the eight visits. According to the monitors, the visits generally went well and there was no need for the monitors to intervene. On a couple of occasions, the monitor noted mother's maternal instincts were evident as she was able to tell what C.J. wanted or needed. Father, however, looked uninterested in C.J. or fell asleep during several of the visits. The siblings usually engaged with C.J. and took turns holding her.

On November 1, 2011, DCFS recommended and the court declared C.J. a dependent of the court. The court permitted parents to have unmonitored day visits with C.J. after November 28, 2011, provided they complied with all court orders, which included (1) father's participation in weekly Narconon[5] meetings and maintenance of an attendance card, (2) mother's attendance in a drug rehabilitation program and submission to weekly random drugs tests, and (3) mother's participation with C.J. in a family therapy program.

In an interim review report filed by DCFS, father was reportedly attending weekly Narconon meetings but failed to provide an attendance card. Mother submitted to six random drug tests between October and November 2011, all of which returned negative results. Although mother stated she was enrolled in a drug treatment program, she could not provide proof of her enrollment and/or attendance. In addition, while the court ordered a minimum visitation of three times a week, mother visited C.J. twice weekly,

---

**4** The scheduled visits occurred on August 11, 2011; August 17, 2011; August 18, 2011; August 24, 2011; August 25, 2011; September 1, 2011; September 2, 2011; and September 9, 2011.

**5** "Narconon is a non-profit drug rehabilitation program dedicated to eliminating drug abuse and drug addiction through drug rehab, drug information and drug education." (<http://www.narconon.org> (as of Jan. 6, 2014).)

and father once weekly, during the two weeks prior to the report's date. DCFS noted its concern regarding the parents' continued failure to fully comply with the court's orders despite knowing that full compliance was necessary to gain liberal visitation with C.J.

On December 20, 2011, DCFS recommended and the court ordered C.J.'s removal from mother and father's custody and placed her in DCFS's care for suitable placement. The court ordered family reunification services and monitored visitation for the parents.

On May 3, 2012, DCFS filed a section 342 petition after father and mother engaged in a physical altercation during a domestic dispute. The petition was dismissed as to C.J. C.J.'s permanency plan hearing was continued to June 12, 2012.

In reports prepared for the June 12 hearing, DCFS reported C.J. bonded with her foster mother and appeared to be responsive to mother and her siblings. Mother visited C.J. through the foster mother once or twice a week and called about three times per week. According to the foster mother, the quality of the visits was good. C.J.'s siblings accompanied mother on her visits at least once a week. Mother stated father visited C.J. through her foster mother on May 13, 2012. The social worker attempted to contact father on at least six separate occasions, but was unsuccessful. Father did not contact DCFS to schedule a monitored visit with C.J.

As for mother's weekly drug tests, DCFS reported mother tested positive for marijuana on four out of eight tests.[6]

C.J.'s June 12, 2012 permanency plan hearing was continued to July 25, 2012. At the July 25 hearing, the court determined C.J.'s return to the physical custody of either parent would create a substantial risk of physical or emotional harm. The court set the matter for judicial review on January 23, 2013.

A status review report prepared for the January 2013 hearing discussed mother and father's continuing failure to comply with the court's orders. Mother failed to appear at

_____

[6] The positive test results occurred on May 4, 2012; June 11, 2012; June 29, 2012; and, July 6, 2012. Mother tested negative for drugs on May 22, 2012; June 13, 2012; and July 16, 2012, and an invalid test resulted on June 26, 2012.

4

12 of the 24 scheduled drug tests,[7] tested positive for marijuana on three separate occasions,[8] and tested positive for alcohol on one occasion.[9] Mother failed to enroll in a drug rehabilitation program and did not participate in conjoint therapy with C.J. Father failed to contact DCFS to provide information as to his enrollment and progress in the court ordered programs.

DCFS further reported both parents and the siblings had sporadic visits with C.J. between October 2012 and January 2013. Father did not appear for six of the 10 scheduled visits with C.J. and made no attempts to reschedule those visits.[10] Mother did not appear for nine of 13 scheduled visits with C.J.[11] As for the siblings, while they appeared happy to visit with C.J., they did not engage with C.J. as they were usually busy playing with one another playing games.

Because of the parents' continuing failure to comply with court orders, DCFS recommended termination of reunification services for both parents and setting a section 366.26 hearing.

On January 23, 2013, the court terminated family reunification services for mother and father after finding mother in partial compliance and father not in compliance with the court's orders. The court scheduled a section 366.26 selection and implementation hearing, and ordered monitored visitation for mother.

---

**7** Mother did not appear for her drug tests on July 18, 2012; August 23, 2012; September 7, 2012; September 12, 2012; September 26, 2012; November 16, 2012; November 21, 2012; November 29, 2012; December 7, 2012; December 13, 2012; December 26, 2012; and January 4, 2013.

**8** The dates of the positive test results are August 16, 2012; September 21, 2012; and October 4, 2012.

**9** The date of the positive test result is September 21, 2012.

**10** Father visited C.J. on October 11, 2012; October 18, 2012; November 8, 2012; and December 6, 2012.

**11** Mother contacted the foster mother directly on two separate occasions to visit with C.J. Mother visited with C.J. on October 6, 2012; October 11, 2012; October 25, 2012; November 3, 2012; December 6, 2012; and January 3, 2013.

On March 1, 2013, C.J. was placed with her new foster parents, Donald and Susan L.

The section 366.26 report prepared for the April 30, 2013 hearing stated: "During this period of review there has been little [change] in the [status] of the case. The mother and father continue to be out of compliance with Court orders. The mother and father have failed to demonstrate that the concerns that brought this case to the attention of DCFS have been remedied." The report additionally noted that, "while the mother continues to visit the child . . . , her visits are not always consistent and the father has not visited with the child during this period of supervision."

On April 30, 2013, mother and father requested a contested section 366.26 hearing. The court asked for an offer of proof. Father's counsel replied: "[W]e're going to submit evidence that shows that terminating parental rights would be detrimental to [C.J.] because she would benefit from the continued contact." Father's counsel continued: "[C.J.] is very young, but she does recognize my client as her father. She enjoys the visits and also does have other siblings that see her regularly, and I believe that termination of parental rights would interfere with sibling contact. [I]t would be very important to her and for her to know her entire family, Your Honor."

Like father, mother's offer of proof was based on "visitation not only for [mother], but also with the sibling."

Finding the offers of proof insufficient, the court determined it was reasonably unlikely the court would be persuaded that termination of parental rights would be detrimental to the child. The court stated:

> "The argument is that [C.J.] recognizes her father. [C.J.] enjoys her visits with her mother and her father and her siblings. [¶] Visitation in and of itself is insufficient to persuade the court that it would be detrimental to terminate parental rights. . . . [¶] . . . [¶] The child is not even two years old. The . . . offer of proof does not advise me that the relationship between the child and mother through visitation benefits the child so significantly to outweigh the strong preference for adoption. This child may have an enjoyable time during the visits. That's not sufficient to deprive the child permanency provided through adoption.

6

"There is no evidence offered that this child has a significant, positive, emotional attachment to either of her parents. There is no evidence that either parent occupies a parental role. There is no evidence that if I terminate parental rights, this child would be greatly harmed.

"[W]hile this child may recognize her father at visits and may even recognize her mother at visits, they have not occupied a parental role. [A] friendly relationship may be beneficial, but it is not sufficient in and of itself to deprive this child of the permanency provided through adoption."

As for C.J.'s siblings, the court stated: "[T]here's no evidence presented that [C.J.] has any significant, emotional attachment to her siblings."

Finding by clear and convincing evidence that C.J. would likely be adopted, the court terminated parental rights and placed C.J. in DCFS's care, custody and control for the purposes of adoption planning and placement.

## DISCUSSION

Both mother and father argue the court violated their due process rights when it denied their request to present relevant evidence of the beneficial parent-child relationship and sibling relationship exceptions pursuant to section 366.26, subdivision (c)(1)(B)(i) and (v). Section 366.26, subdivision (c)(1) states, in pertinent part: "If the court determines . . . , by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . unless . . . : [¶] . . . [¶] (B) . . . [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship [or] [¶] . . . [¶] (v) There would be substantial interference with a child's sibling relationship . . . ." Mother and father contend they would have been able to prove the applicable exceptions had the court granted a contested hearing. Both parents claim the juvenile court's denial of their request for a contested hearing was prejudicial and requires reversal. We disagree.

"[A] parent has a right to 'due process' at the hearing under section 366.26 which results in the actual termination of parental rights. This requires, in particular circumstances, a 'meaningful opportunity to cross-examine and controvert the contents of the report.' [Citations.]" (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816-817.)

7

However, "due process is not synonymous with full-fledged cross-examination rights." (*Id.* at p. 817.) It "'does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest.'" (*In re Earl L.* (2004) 121 Cal.App.4th 1050, 1053.)

Here, the issue before the juvenile court was whether the parents' offer of proof was sufficient to set the matter for a contested 366.26 hearing. Mother and father argued the beneficial parent-child relationship and sibling relationship exceptions applied. (See § 366.26, subd. (c)(1)(B)(i), (v).) However, rather than presenting a "specific" offer of proof, which "set[] forth the actual evidence to be produced," mother and father "merely [identified] the facts or issues to be addressed and argued." (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1124.) Father argued C.J. recognized him as her father, enjoyed her visits with him, and regularly visited with her siblings. Mother simply joined father's argument, adding only that her offer was "based on visitation not only for herself, but also with the sibling."

However, "[a] proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact." (*In re Tamika T., supra*, 97 Cal.App.4th at p. 1124.) With the exception of father's statement that his visits were "consistent . . . in the last few months,"[12] neither mother nor father contested the evidence contained in the social worker's reports. The reports demonstrated mother's continued use of marijuana since C.J.'s detainment in 2011; the parents' inconsistent visits with C.J. between August 1, 2011, and April 30, 2013; and the parents' failure to comply with court orders. Neither parent sought an examination of any witnesses or presented a summary of the issues relevant to the examination of any witnesses. In light of these uncontested facts, there does not appear to be a miscarriage of justice in the court's conclusion that the parents' offer of proof was insufficient to set a contested section 366.26 hearing. (*In re Tamika T., supra*, at p. 1124.)

---

[12] Father stated he visited C.J. once a week in the last few months before the section 366.26 hearing.

8

Even if a contested hearing were granted, a different result would not have been obtained. Neither mother nor father would have been able to show the parent-child relationship involved "more than 'frequent and loving contact,'" or that they were "more to the child than a mere 'friendly visitor or friendly nonparent relative.'" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81.) Here, the parents argued they visited C.J. once a week and C.J. enjoyed her visits with her parents and siblings. However, neither parent showed that he or she occupies "''"a parental role" in the child's life.'" (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) "'[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*Ibid.*)

The parents' contention that they visited C.J. once a week in the months before the section 366.26 hearing does not give rise to the kind of parent-child relationship required under the benefit exception. Such a relationship "'characteristically aris[es] from day-to-day interaction, companionship and shared experiences.' . . . [Citation.]" (*In re K.P., supra*, 203 Cal.App.4th at p. 621.) C.J. was removed from her parents' custody when she was less than a month old and spent the majority of her young life in a foster home. The parents' visitation, which was inconsistent throughout the entire period of review, never progressed beyond monitored visitation with only the narrow exception that father was initially allowed to visit C.J. in her placement without a monitor. Mother's interaction with C.J. lessened over time. Father appeared uninterested in C.J. or fell asleep during his visits with the child. Based upon the totality of the record, there is no evidence to controvert the court's finding that the parents' "friendly relationship" is "not sufficient in and of itself to deprive this child of the permanency provided through adoption."

Similarly, the record supports the court's finding that the sibling relationship exception did not apply. Under section 366.26, subdivision (c)(1)(B)(v), the court must balance whether "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether

9

the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest . . . ."

As their offer of proof, the parents merely argued the "other siblings . . . see [C.J.] regularly, . . . termination of parental rights would interfere with sibling contact," and "it would be very important to [C.J.] to know her entire family." As the court properly recognized, "there's no evidence presented that [C.J.] has any significant, emotional attachment to her siblings." The record shows that C.J. was not raised with her siblings in the same family home because she was removed from the home very early on. The siblings' interaction with C.J. was limited as they were busy playing games during the monitored visits. In addition, neither father nor mother attempted to contest the record by specifically showing that C.J. shared a close relationship with her siblings or that maintaining C.J.'s relationship with her siblings was in her best interest. Thus, there was sufficient evidence to support the court's finding that the sibling relationship exception did not apply.

Based upon this record, we conclude that a contrary result would not have been obtained if mother and father's request for a contested hearing were granted. "[E]ven under the most stringent test of prejudice applicable to a denial of due process, remand for a contested hearing would constitute an idle act and [any] error must be seen as harmless beyond a reasonable doubt." (*Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1387.)

## DISPOSITION

The order is affirmed.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.                    RUBIN, J.

10