Filed 7/23/14  L.C. v. Super. Ct. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| L.C., | |
| Petitioner, | E061091 |
| v. | (Super.Ct.No. SWJ003525) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  John M. Monterosso, Judge.  Petition denied.

Marla C. Mahoney for Petitioner.

No appearance for Respondent.

1

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Real Party in Interest.

Petitioner L.C. (Mother) challenges the ruling of the trial court terminating services and setting a selection and implementation hearing (Welf. & Inst. Code, § 366.26)[1] with respect to her children, minors T.C. and Tr.C.[2] She argues that the trial court erroneously found that returning custody to her would be detrimental, and also that she was not offered reasonable reunification services. We disagree, and deny the petition.[3]

## STATEMENT OF FACTS

The subject minors, T.C. and Tr.C. (the minors), were born in 2004 and 2006, respectively. The Department of Public Social Services (Department) filed the initial petition on September 26, 2012, and in essence alleged that the minors had no one to care for them because Mother had been hospitalized under a section 5150 mental health evaluation hold.

Although the children appeared well cared for and expressed no concerns about Mother, Mother had been taken into medical custody after calling police about pictures

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

[2] We use this format because the first names of both children begin with the letter "T."

[3] The minors are placed with a relative who apparently remains confidential, and the expectation is that a legal guardianship will be established. The trial court ordered continued visitation.

on her cell phone. She then drove her vehicle at a high rate of speed towards a deputy sheriff, and then got out of her car rambling about the photos, her cell phone, and the man supposedly in the photos who "can walk through doors without opening them and he has red and blue eyes, with faces on the back of his head that looks like [c]ourtroom [j]udges." She had also recently been involved in a physical altercation with her mother. Mother called the Department and made rambling, incoherent comments apparently relating the person in the photos to the children's father, who had not been in their lives since before Tr.C. was born.

When contacted, the father reported that Mother had "'major mental health concerns'" and could be violent towards him, animals and the children, claiming that she had once tried to suffocate T.C. He also reported that Mother sometimes claimed that "Kevin," not she, had committed the violent acts.

Mother called the social worker again the next day, speaking erratically and jumping from topic to topic and blaming police for her apprehension. She said she had "told him [the officer] it was Brandon Johnson [the minors' father], this guy is capable of hurting anyone and he does not care. This is the type of person that can get into your house without keys . . . !" She admitted using multiple medications for pain and that "I don't get wasted but I get off balance" before moving on to claim that "people on the baseball league called in a false report saying that I was hitting on their husbands. I called an attorney and said 'This is harassment.'"

3

When the social worker, in response to Mother's question about getting her children back, advised her to get a mental health evaluation and any recommended medications, Mother snapped "What makes YOU tell me about mental health . . . I feel that you're treating me, judging me. You're making me feel that this might be a long time but I want my kids now. I will not have any money because I only get Cash Aid and now I won't . . . ."

Mother's prior history with child protective services included substantiated allegations of emotional abuse and general neglect in 2003 and 2004, including threats to drive off a cliff with T.C., which Mother made at a family law court hearing. T.C. was made a dependent child at that time and in 2006 Mother regained full custody. Mother has three older children who live with their father.

After finding the minors to fall within section 300, subdivision (b), Mother was ordered to undergo a psychological and psychiatric assessment, to participate in counseling, to complete a parenting class, and to submit to random drug testing as well as be evaluated by a substance abuse treatment program.[4]

The six-month report was filed on May 29, 2013. During the reporting period concerns had arisen based on reports of fires at Mother's residence, apparently resulting from a defective gas line. Mother had reported that she was forced to orally copulate one

_____

[4] The court, perhaps inadvertently, did not order the psychological/psychiatric evaluation at the time of the jurisdictional findings on December 11, 2012; the omission was corrected by the order of March 11, 2013.

of the firefighters.  A police investigation of this claim resulted in the conclusion that Mother was having visual and tactile hallucinations.[5]

Mother had refused to speak to the social worker when scheduled to do so after a visit with the minors, saying she would provide an answer to the judge and telling the social worker to "[g]o to Hell."  Mother had attended several counseling sessions (although once demanding a change of therapists), but this had been put on hold because the psychiatric report reflected the opinion that Mother could not benefit from services. The therapist deferred further meetings until Mother could be stabilized on psychotropic medication.  Mother had refused to complete required drug tests.

Mother had been referred for a medication assessment, which took place on February 19, 2013.  According to the report from the Department of Mental Health, Mother denied any crisis, denied paranoid or delusional thinking, denied ongoing depression, and stated that she did not need medication.  Based on these statements, it was found she was not in need of such services.  However, after the psychiatric report was received, it was decided to re-refer Mother, but she could not be scheduled until May 2013.

---

[5] The social worker included the actual investigative report.  Although the social worker's report could lead to the assumption that Mother had fabricated or imagined everything, in fact one of the firefighters returned to her home later to offer her a working stove, and a sexual act was performed.  The firefighter claimed that it was consensual, and as Mother's rather vague description included no assertion of actual force, the investigation was inconclusive.

The psychological report itself raised serious issues. The evaluator commented that Mother was "a very difficult interview subject." Her responses when the evaluator attempted to take a life history were frequently tangential or irrelevant and information could be obtained only with persistence. Asked if she ever heard voices when no one was around, Mother responded "My stomach does that." Mother "completed" four standardized tests, but three were deemed invalid due to missing data. The fourth reflected no tendency towards child abuse although it showed that Mother had a rigid parenting style. Even without the test results, the evaluator believed that Mother suffered from a psychotic disorder and also demonstrated paranoia. It was his opinion that due to being "overtly psychotic," Mother could not then benefit from services or safely care for the minors. He recommended treatment and psychotropic medications.

Mother had been consistent in visiting the minors although she was often late. She generally prepared for the visits with games, books, and drinks for the children. However, it was noted that she was often argumentative and accusatory towards both the minors (especially T.C.) and the supervising staff. On one occasion, Mother got up to leave the visit early and said with respect to T.C. "'[t]his child is becoming a nuisance and a spoiled rotten brat. I'm not going to listen to this.'" The cause of this remark was that the two children were tossing a ball between them rather than playing the game chosen by Mother. Mother also discussed inappropriate subjects such as her finances with the children, causing Tr.C. at least to become anxious about money. Mother exhibited constant mood swings during the visits, changing from being cheerful to critical

6

or complaining, and tended to focus attention on her own issues and needs rather than those of the children. Both minors, in the social worker's opinion, recognized Mother's unpredictability and tried to respond to questions in a placating manner. It was also noted that the minors played well with each other when not with Mother, but that Mother's favoring of Tr.C. caused them to bicker during visits. At one visit just prior to the hearing, Mother falsely told the children she had gotten a pool for the residence, then told them this was untrue. At the same visit Mother appeared to have visual and aural hallucinations.

Mother had also behaved inconsistently when asked to provide medical releases; she signed them and then asked that they be destroyed, and attempted to revoke the authorizations.

Despite these concerns, the social worker recommended that services continue, and this was the order of the court.

By the time the report was prepared for the 12-month hearing, more of Mother's medical and mental health records had become available. After being assessed for medication, on June 24, 2013, Mother was prescribed Depakote ER and Celexa. The clinician described her as "rambling, raising her voice at times, agitated and unpleasant . . . displaying many signs of paranoia, unable to talk during most of the interview." Six weeks later Mother returned to the office complaining about having been prescribed medication and having been "made to sign the medication consent." She stated that she had stopped taking Depakote. Eleven days later Mother appeared at the

7

Department of Mental Health demanding her records and telling staff that she had been "tortured" by the Department. She also informed staff that she had filed complaints and lawsuits.

Two weeks later (on September 3, 2013) Mother returned to the clinic and along with various complaints asserted that she was not paranoid because all of her complaints are true. By that time, she had also been prescribed Abilify, but her insurance did not cover it, and staff assisted her in finding a new provider although she was reluctant to sign a medical release.

By the time she met with the social worker on October 3, Mother was taking three mental health medications in addition to the 11 medications prescribed by her personal physicians.[6] She appeared less argumentative at an October 2013 meeting. The social worker's attempts to contact the Department of Mental Health were hindered by the latter's failure to respond and the fact that Mother had "pulled" her consent for the release of her records.

Mother failed to appear for random drug testing on several occasions over the summer of 2013. When she told the social worker that she did not always have money for gas, she was offered a bus pass, which she refused.

However, by the time the 12-month report was prepared, the social worker indicated that Mother's behavior during visits was less problematic. Although the social

---

[6] She was taking several pain medications (Lidoderm, Neurontin, baclofen, and ibuprofen) prescribed by at least two different doctors, and several allergy medications.

worker felt that Mother's progress had been minimal, the recommendation again was for continued services, and again this was the order. The court also authorized unsupervised liberal and overnight visits if Mother continued to comply with her case plan.

The 18-month report was filed on March 18, 2014. This reflected that in December 2013 and March 2014, the social worker, making an unannounced visit to Mother's home in the early morning, had found nonrelative males in the house in Mother's absence. Mother was attending her appointments at the Department of Mental Health. She had also begun counseling and was reported to be making positive, motivated efforts. However, she later rescinded her consent for disclosure, so the Department could not obtain current information or opinions from her therapist.

Visits continued to be more appropriate than had earlier been reported. However, in February and March 2014 Mother had called police, once to complain about her attorney and the second time to report a disagreement with a neighbor. Mother also tested positive for marijuana twice.[7] On February 13 she called the social worker with a question about visits, and was noted to be "giggling, laughing, and [to have] pressured speech." The minors' caregiver also reported that Mother sometimes sounded "'loopy'" during telephone calls.

In recommending that the minors not be returned to Mother, the social worker focused on her lack of regular drug testing (although Mother has never had a "drug

---

[7] Mother apparently has a "medical marijuana" card in addition to her pain medications.

9

problem" other than her use of prescription marijuana) and her lack of candor concerning her living companions (if any).

At the hearing on April 24, 2014, Mother presented only stipulated evidence. There was evidence that the minors would testify that they loved Mother and wanted to return to her. There was also a stipulation that if Mother were to testify, she would testify that she loved her children; that visits had been consistent and appropriate; that she had maintained the same residence since 2004; that she had completed a parenting class; that she had been found not to need substance abuse treatment; that she had completed the psychological evaluation and medication assessments; that she had been medication compliant since September 2013; and that she was in counseling. It was also stipulated that Mother had always provided for the children and had only been "5150'd" twice. Finally, Mother stipulated to her frustration with the proceedings and acknowledged inappropriate interactions with the Department.

In terminating services and refusing to return the minors to Mother's custody, the trial court focused on Mother's marijuana use and her refusal to consent to the disclosure of information by her therapist. Although it recognized that Mother was authorized to use marijuana, it was concerned about the effects of this "self-medicati[on]" with a mood-altering drug on her prescribed mental health medications[8] and the fact that she

---

[8] As the trial court made its remarks, Mother indicated that she had told her mental health care provider about the marijuana use, but the social worker's report indicated that the doctor told the social worker that she was *not* aware of this.

appeared to be under the influence during one telephone conversation. The trial court also drew an inference negative to Mother from her refusal to consent to her therapist's release of current information.

Tellingly, after the trial court announced its decision, Mother spontaneously complained to the court that "I did not realize I was supposed to remain at my residence at any given time. I wasn't in contact with my social worker in order to be an open book to let them—and be at their beck and call at any time they were to come over. I thought I was free to live my life, free, at will, but I don't have any money to do anything or go anywhere. What happens if I rent a room out in order to sustain myself?"[9]

DISCUSSION

A.

The first issue raised by Mother is that the trial court erred in finding a substantial risk of detriment if the minors were returned to her custody.[10] The standard is a fairly high one, and the fact that the parent is not perfect or has not made as much progress as might have been hoped is not a valid basis for a finding of detriment. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) However, our review of the trial court's decision applies the "substantial evidence" test. (*In re B.S.* (2012) 209 Cal.App.4th 246, 252.)

---

[9] This quasi-outburst may go a long ways in explaining why Mother's counsel chose to have her present her evidence by stipulation.

[10] Section 366.22, subdivision (a), prohibits return if there is a "substantial risk of detriment to the safety, protection, physical or emotional well-being of the child."

11

We agree, as did the trial court, that Mother had demonstrated over the last five or six months good compliance with her mental health treatment and medication requirements, and that treatment had apparently resulted in improved behavior during visits. However, her refusal to allow her therapist to communicate with the social worker (and thus indirectly with the court) fully justified the negative inferences drawn by the court to the effect that either her progress, her participation, or both, had deteriorated since the therapist's previous communication with the social worker. Although an inference is not itself evidence, it may be relied upon to support a verdict or other judgment. (*Ajaxo, Inc. v. E\*Trade Group Inc.* (2005) 135 Cal.App.4th 21, 50.) Mother's refusal also raised serious questions concerning her willingness to continue to cooperate if the minors were returned to her under a family maintenance plan. Mother's use of marijuana to the extent that it apparently affected her thought processes constitutes further support for the trial court's belief that Mother did not have insight into her mental health issues or a handle on dealing with them.

We also acknowledge that at least since the termination of the previous dependency, Mother has adequately cared for the minors. However, in light of the reports of past violence on Mother's behalf and her current diagnosis as psychotic (a diagnosis which the record, to the lay reader, fully supports), as well as her difficulties in recognizing that she even has mental health issues, the family situation was clearly perilous at the time these proceedings began. Although the Department bore the burden

12

of proof of detriment, the original risks of harm to the minors were not shown to have been resolved by Mother's consistent stability.  Accordingly, we uphold this finding.

B.

Mother then argues that services were not adequate because she was not given unsupervised and extended visitation with the minors.  It is well established that the 18-month limitation on services may, or must, be disregarded if the parent has not received adequate services.  (See *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388.)

To a large extent we view this argument as a red herring because the trial court's decision not to return the minors to Mother's custody was not based on any issues with her visitation or questions as to the minors' bond with her.  A few overnight visits over the last few months of the dependency would not necessarily have affected the trial court's views, even if they had gone well.

But on the merits, we cannot say that the Department's failure to authorize such visits constituted inadequate services.  Such visits were conditioned upon her compliance with drug testing, and she did not comply, both missing tests and testing positive for marijuana.  The concerns we noted above concerning Mother's use of various substances apply equally to the prospect of allowing unsupervised visits in Mother's home.[11]  The Department was not required to allow such visits.

---

[11]  We do note that Mother has not been found to have issues with the abuse of unprescribed substances.  However, her polysubstance reliance, including the use of known addictive narcotics plus marijuana, remains cause for concern.

DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST _____

J.

We concur:


RAMIREZ _____

          P. J.


RICHLI _____

        J.