Filed 2/23/15  In re Robin D. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ROBIN D., a Person Coming Under the Juvenile Court Law. | |
| | D066222 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J517448A) |
| v. | |
| E.T., | |
| Defendant and Appellant. | |

Appeal from a judgment of the San Diego County Superior Court, Kimberlee A. Lagotta, Judge.  Affirmed.

William D. Caldwell for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Dana C. Shoffner, Deputy County Counsel.

This action involves an adolescent, Robin D., with serious cognitive impairments such that he functions on a first grade level. He has had two juvenile dependency cases since 2009 due to physical abuse by his mother, E.T. (the mother) and domestic violence. In the most recent dependency case the mother received over 18 months of reunification services. The mother requested that Robin be returned to her custody. The juvenile court declined, finding that returning Robin to her custody would create a substantial risk of detriment to him. The juvenile court terminated reunification services and ordered a permanent plan of placement.

The mother appeals, asserting (1) despite Robin's cognitive impairments there is insufficient evidence that he will be at substantial risk of detriment if he reunifies with the mother and his siblings; and (2) the error is not harmless because he can still reunify with his mother even after becoming a nonminor dependent. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The 2009 Dependency*

In April 2009, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of Robin, who was then 12 years old. The petition alleged the mother subjected him to serious physical harm in that he had scratches and bruises in various stages of healing on his legs, back, arms and torso, and stated he was in fear of his mother hitting him with a belt.

The detention report stated that in April 2009 Robin was suspended from school for fighting. Before he was sent home he stated he was afraid because the mother would hit him with a belt. The school nurse examined him and found marks, bruises, and

2

scratches to his back, torso, legs and arms. Robin also disclosed that the mother hit him on the head.

Robin had an Individualized Educational Plan (IEP) which stated that his primary diagnosis was "mental retardation." In addition to his cognitive issues, he also had behavioral challenges.

In addition to disclosing physical abuse, Robin told a social worker the mother smoked marijuana and crack cocaine. He also reported the mother and her boyfriend fought in the house, and on one occasion the boyfriend had a knife.

The mother denied striking Robin with a belt. Moreover, she would not answer the social worker's questions concerning substance abuse. The Agency placed Robin and his two siblings in protective custody.

At the special hearing, the juvenile court detained Robin in out-of-home care and made a prima facie showing on the petition.

For the April 29 jurisdictional and dispositional hearing, a social worker reported that the mother received voluntary services due to one of Robin's siblings being sexually abused and to assist the mother in acquiring services to address Robin's cognitive problems. The mother was largely uncooperative with services and the case was closed. The social worker also summarized 16 other prior child welfare referrals as to the family.

When the social worker interviewed Robin he gave conflicting reports of physical abuse. Medical staff at Polinsky Children's Center noted Robin had "old linear scars" and bruising/discoloration to his skin.

At a team decision making meeting in May 2009, the Agency agreed it would recommend that Robin be placed with the mother, as she was nearly done with her parenting classes, and was able to demonstrate what she had learned. The mother agreed to in-home services and to obtain services from the San Diego Regional Center, which provides services to persons with developmental disabilities. The court placed Robin with the mother, conditioned upon her attending his therapy appointments, and also ordered family maintenance services.

At the first family maintenance hearing, Robin remained with the mother but the court found she had not made substantive progress with her case plan. During a home visit, the social worker smelled alcohol on the mother and observed empty liquor bottles in her closet and beer cans in her yard. At the second family maintenance review hearing, the social worker reported the mother still did not seem to understand Robin's special needs, despite the attempts by the school, the mother's therapist, and the social worker. She would leave him alone, let him go places unsupervised, and did not participate in school meetings or regional center services. She was guarded with the social worker and frequently did not appear for appointments.

The Agency recommended that the court terminate jurisdiction as the mother had participated in some services and did not appear amenable to continued services. It was also noted that she was meeting the children's basic needs.

In an addendum report it was reported that the mother followed up with some regional center services and started to progress more in therapy as to understanding Robin's needs. On September 27, 2010, the juvenile court terminated jurisdiction.

4

B.  *The 2012 Dependency*

In October 2012, the Agency filed a petition on behalf of then 16-year-old Robin. The petition alleged the mother hit Robin in the head, resulting in a knot on his head and pain.  It was also alleged that the mother did not protect Robin from being hit by his stepfather.  The petition also alleged Robin had attempted to intervene in a physical altercation between the mother and the stepfather, and the stepfather choked Robin.

The stepfather left the home, the mother followed him, and the children followed the mother.  The stepfather got into a physical altercation with an adult male at a liquor store and the children saw the man had blood on his face.  According to the petition, there was frequent domestic violence in the home, including an incident where the mother swung a knife and hammer at the stepfather, and then slashed tires on a vehicle.  The mother stated that "she doesn't believe every couple doesn't have fights or put their hands on each other sometimes."  The petition noted that the mother violated a safety plan and protective order as to Robin, requiring her to keep the stepfather out of the home and away from Robin.

The detention report noted that altercation, and that the children told a sheriff's deputy about the incident.  The deputy drove the children home, but no one was there. The deputy called the mother, who denied the altercation had occurred, and she told the deputy that Robin was "lying" and was "retarded."  The mother refused to meet with the deputy or speak with him further.  The stepfather was arrested for public intoxication and felony child endangerment.  It was also noted that the stepfather and the mother had "numerous" other incidents of domestic violence.

5

The report also noted an incident that occurred on October 18, 2012. On that date the mother and Robin argued and she punched him in the head, resulting in a significant bump on his left temple and a headache. The mother claimed Robin had fallen in the shower. She also reported that they argued over his wetting the bed. She also claimed that Robin had lied during the last dependency case, and she denied that she ever struck the children. The report further noted that the mother "reluctantly" signed a safety plan October 16, 2012, agreeing that she would not allow the stepfather to have contact with the children.

On October 17, 2012, the stepfather was released from custody after he pled guilty to misdemeanor battery against the mother. A criminal protective order was issued against the stepfather. Nevertheless, Robin reported that the stepfather returned to the home the day he was released. Robin also reported that the mother and stepfather were "getting high" and "smoking weed" in their bedroom that night. The mother denied that the stepfather returned to the home and denied any drug use.

Robin was removed and detained with a nonrelative extended family member, a maternal aunt. However, that family member stated that she could not meet Robin's needs on a long-term basis. The report also summarized 25 prior child welfare referrals.

At the detention hearing, the juvenile court detained Robin in out-of-home care and made a prima facie finding on the petition.

In the November 14, 2012 jurisdiction and disposition report, the social worker recommended Robin remain in out-of-home care, and that the mother receive supervised visits and reunification services.

6

Mother's counsel set the matter for trial. At the trial the juvenile court made a true finding on both counts of the petition, declared Robin a dependent, placed him with a nonrelated extended family member, and ordered reunification services for the mother.

C. *The Reunification Period*

On June 11, 2013, the six-month review hearing was held. For that hearing the Agency recommended that Robin remain in out-of-home care and that the mother receive six more months of reunification services. Robin was 16 years old at that time. The social worker requested that the regional center reactivate his case. He participated in life skills classes at school, and showed improvements in his behavior. He did not seem interested in returning to the mother's care.

The mother was attending a domestic violence group. Her psychological evaluation stated that she minimized psychological distress, was guarded and defensive, and had limited insight into her mental health. She was diagnosed as follows: physical abuse of child, neglect of child, rule out substance abuse, and as having a personality disorder not otherwise specified. The psychologist opined that the mother's denial of personal shortcomings would likely interfere with her ability to adequately participate in services. The psychologist further opined that the mother would not benefit from therapy due to her lack of insight, lack of motivation and denial of problems.

The mother refused to participate in parenting classes, because she had completed one during the first dependency case. She visited Robin weekly, but he was hesitant to move to unsupervised visits with her. The mother denied Robin was removed from her care due to domestic violence and physical abuse.

7

The juvenile court followed the Agency's recommendations and ordered six more months of services for the mother. It maintained Robin's placement in out-of-home care and found the mother had not made substantive progress with the reunification plan.

The court thereafter appointed a court appointed special advocate (CASA) for Robin.

For the 12-month permanency hearing, the Agency once again recommended that the mother's services be terminated and that the court order a permanent plan of placement for Robin. The social worker reported that Robin was stable in his placement, school and services. The mother was still attending domestic violence groups. However, she was unwilling to enroll in a parenting class, which was part of her case plan. The mother was also inconsistent with her visits with Robin. She had not requested a visit in the two months prior to the hearing. The social worker opined that the mother was still a risk to Robin because she minimized the protective issues, refused to participate in parenting classes, and did not appear to understand the scope of his disability. She also was unwilling to address her own mental health.

The Agency thereafter changed its recommendation and recommended reunification services be offered up to the 18-month date, and maintain Robin in out-of-home care. The juvenile court followed the Agency's recommendation.

On April 16, 1014, the 18-month permanency hearing was held. The Agency again recommended that reunification services be terminated and that the juvenile court order a permanent plan of placement for Robin. Robin's CASA concurred with the Agency's recommendation. The mother had been close to completing her domestic

violence classes, but was discharged for excessive absences. She still did not visit Robin consistently, and he continued to resist her visits. Robin's teacher informed the social worker that Robin was having troublesome behavior at school, such as slapping other students, cursing, impulsivity, and crying. The Agency coordinated therapy services for him but the caregiver did not bring him.

Mother's counsel thereafter set the matter for trial.

D. *Trial*

On May 29, 2014, the trial in this matter commenced.

1. *The mother's testimony*

The mother testified that Robin came into protective custody because he fell in the shower and went to school with a bump on his head. However, she did admit that he intervened in domestic violence committed by his stepfather against the mother. She denied hitting him with a belt when he was taken into protective custody in 2009. She did not believe there was any basis for him being taken into protective custody in 2012. She believed that she parented in the same manner as she did at the time of his removal.

According to the mother, she was one class away from completing her domestic violence program. She claimed that she had learned to walk away from domestic violence and not allow her children around it. She asserted there had been no domestic violence with the stepfather since Robin's removal in 2012. However, she also claimed there had been no prior domestic violence.

9

The mother testified in December 2013 she started her parenting classes, which she attended weekly. She learned through those classes to sit down and talk with her children if they were having problems, and they had family meetings so everyone could say what was on their minds. The mother stated that those techniques had been successful. She also testified that she had been working seven days a week in home health care for the elderly.

As for Robin's special needs, the mother testified that he suffered from mental retardation. She stated he needed regional center services and his IEP program at school. He also had an advocate through the regional center.

The mother stated that she had three other children living with her, ages 20, 16 and 14. She wanted the juvenile court to return Robin to her so he could reunite with his siblings.

2. *Testimony of social worker Melinda Meeken*

Social worker Melinda Meeken was the social worker on this case since January 2013. The issues that led to protective custody were physical abuse of Robin by the mother and emotional abuse due to extensive and chronic domestic violence.

Meeken testified that the mother's progress in her domestic violence program was inhibited by her inconsistent attendance. She also was concerned about the mother's ability to articulate frustration and express anger in an appropriate manner.

The mother also refused in-home parenting services. She did not start a parenting class until December 2013, although referrals were given to her earlier. Her domestic violence service provider found the mother to be at the basic expectation level, but

10

having completed 51 weeks in the program, Meeken had hoped she would have progressed further.

Meeken testified that the mother's denial of the protective issues during her testimony at trial demonstrated that she had not benefitted from the services at all. Given the mother's denial of the protective issues, she was not able to empathize with Robin's feelings or what he had gone through. That was part of the reason she opined it would be detrimental to Robin to be returned to the mother. Because Robin had special needs, he required a consistent caregiver, a role the mother had demonstrated she could not occupy.

3. *The court's decision*

The juvenile court found by a preponderance of the evidence that returning Robin to the mother would create a substantial risk of detriment. The court noted the mother's inconsistent attendance in her domestic violence program impacted her ability to benefit from the program and to ameliorate the behavior that brought Robin into the dependency system. The juvenile court also noted the mother chose to wait until late in the case to participate in parenting education. Because of this, she was not in a position to appropriately parent Robin, who had special needs and required special attention. The court also found that the physical and emotional abuse issues of the family remained unresolved.

The court found that the Agency had proved by a preponderance of the evidence that a return of Robin would create a substantial risk of detriment. The juvenile court also found by clear and convincing evidence that the mother received reasonable services and had not made substantive progress with her case plan. The court also noted the

11

mother's lack of insight, in particular her continued denial of physical abuse of Robin. That lack of insight caused the court great concern as to the safety and appropriateness of returning Robin to the mother's custody. It terminated the mother's reunification services and found there was a compelling reason not to set a section 366.26 hearing. Accordingly, the court ordered a permanent plan of placement for Robin.

DISCUSSION

The mother asserts the juvenile court erred in not returning Robin to her at the 18-month permanency review hearing. She asserts there is no substantial evidence it would be detrimental to Robin to place him with her as she had other teenagers living at her home, his cognitive impairments would not prevent him from reporting abuse, and he was nearly 18 years old and could then move out of her house if the conditions proved detrimental. This contention is unavailing.

A. *Standard of Review*

A reviewing court must uphold a juvenile court's findings and orders if they are supported by substantial evidence. (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1036-1037.) "[W]e must indulge in all reasonable inferences to support the findings of the juvenile court [citation], and we must also '. . . view the record in the light most favorable to the orders of the juvenile court.' [Citation.]" (*In re Luwanna S.* (1973) 31 Cal.App.3d 112, 114.) The appellant bears the burden to show the evidence is insufficient to support the court's findings. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

B. *Applicable Authority*

A court may extend services beyond the 18-month date only in an extraordinary case. (*Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377.)

The juvenile court must return a dependent child to the custody of the parent at the 18-month review hearing "unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . In making its determination, the court shall review and consider the social worker's report and recommendations and . . . shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself of services provided." (§ 366.22, subd. (a).) However, "the decision whether to return the child to parental custody depends on the effect that action would have on the physical or emotional well-being of the child." (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 899.)

In explaining the purpose of the section 366.22 hearing, it has been noted: "[T]he Legislature has determined a child's need for stability and security with a definitive time frame becomes paramount. The cutoff date for fostering family reunification is the 18-month status review. At this hearing, the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.) Mandatory reunification services are limited to no more than 18 months. (§ 361.5, subd. (a).)

Considering the juvenile court's wide discretion in ruling at the 18-month review hearing, appellate courts will uphold the court's finding of detriment if it is supported by substantial evidence. (*Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 705.) To determine whether there is substantial evidence to support the court's findings, we review the evidence most favorably to the prevailing party and indulge in all legitimate and reasonable inferences to uphold the court's ruling. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

C. *Analysis*

We conclude that the court did not err in finding that it would be detrimental to return Robin to the mother's care. Although late in the proceedings the mother participated in domestic violence classes and parenting education, she remained in denial as to the protective issues in this case. She denied physically abusing Robin and remained in a relationship with the man with whom she had extensive domestic violence. Moreover, this was Robin's second dependency for physical abuse by the mother. These facts, as well as Robin's cognitive difficulties and inability to protect himself, amply support the juvenile court's findings.

Social worker Meeken's testimony also provided substantial evidence to support the juvenile court's decision. She detailed the mother's inconsistent attendance in her domestic violence program, which hindered her progress. Her consistent denials of abuse, even at trial, demonstrated that she had not benefitted from the services provided to her. Moreover, the mother's denials made her unable to assist Robin in addressing the trauma he suffered.

Further, the psychological evaluation of the mother supports the juvenile court's findings. That evaluation revealed that the mother was defensive and guarded and minimized her psychological distress. She displayed limited insight and the traits of a personality disorder. As a result, the psychologist opined that the mother had a reduced ability to fully participate in services and likely would not benefit from therapy.

In sum, substantial evidence supports the juvenile court's findings.

The mother asserts that the juvenile court's error in failing to reunify Robin with his mother and siblings is not harmless error because he can still reunify with the mother even if he eventually becomes a nonminor dependent. However, as we have discussed, the juvenile court did not err in ordering that Robin not be reunified with the mother. Thus, we need not further address this issue.

Moreover, the statutory timeframes for reunification apply, even in nonminor dependency cases under section 361.6, subdivision (a). As we have detailed, *ante*, the mother already had received the maximum amount of services available to her under section 361.5. Thus, there is no additional reunification time available to her and thus her contention she can still reunify with Robin is unavailing. Finally, as we have discussed, the mother did not acknowledge the protective issues in this case, Robin did not want to visit with her unsupervised or be placed with her, and he remained at risk of physical abuse if returned to her care.

15

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

HALLER, J.

McINTYRE, J.