Filed 2/15/23  D.M. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| D.M.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al.,<br><br>        Real Parties in Interest. | A166764<br><br>(Contra Costa County<br>Super. Ct. No. J21-00035) |

D.M. (mother) petitions this court for extraordinary writ review of a juvenile court order setting a selection-and-implementation hearing under Welfare and Institutions Code[1] section 366.26 for her five-year-old son, W.R. Mother claims the court erred by concluding that no extraordinary circumstances justified extending her reunification services past the statutory period.  We disagree and deny the petition.

---

        [1] All further statutory references are to the Welfare and Institutions Code.

1

# I.
## FACTUAL AND PROCEDURAL
### BACKGROUND

In January 2021, then three-year-old W.R. was with his father, also named W.R. (father), when father was involved in a hit-and-run and arrested for charges including attempted murder and assault with a deadly weapon.[2] The Contra Costa County Children & Family Services Bureau (Bureau) had already received referrals for W.R. involving father's drug use and domestic violence against mother, and mother had agreed to seek a permanent restraining order against father and not permit him to care for W.R. without supervision. W.R. was detained and placed in foster care.

Later that month, the Bureau filed a petition alleging the juvenile court had jurisdiction over W.R. under section 300, subdivision (b)(1), because mother had placed him at a substantial risk of harm by permitting father to care for him. At the detention hearing, the juvenile court found a prima facie showing was made that W.R. was a child described in section 300. The court ordered that mother receive two supervised visits per week. It also ordered that she receive parenting education and counseling. Father, who was still in custody, was not permitted to have contact with W.R.

In April 2021, after a contested jurisdiction hearing, the juvenile court sustained the allegations that mother had endangered W.R. by allowing him to be in father's care despite the domestic violence and father's drug use. The court's prior order regarding services and visitation for mother remained in effect.

The disposition report filed later that month noted that W.R. was now living with a maternal great aunt. Mother had visited W.R. consistently,

---

[2] Father did not file a writ petition, and we do not discuss facts related to him except to the extent they are relevant to mother's petition.

2

missing only one visit, and had "daily telephone and FaceTime contact with [him]." She was also "participating in a weekly women's support group" and had "enrolled in parenting education classes." The Bureau recommended that mother receive reunification services.

At a hearing later in April 2021, the juvenile court found that placing W.R. with mother would pose a substantial danger to him, although she had made "partial" progress toward "alleviating or mitigating the causes necessitating placement in foster care." The court ordered reunification services as proposed in the case plan. Under the plan, mother was required to participate in a domestic-violence program, individual counseling, and parenting education. The court continued to allow mother to have two supervised visits per week and also authorized overnight visits.

In July 2021, a supplemental petition was filed because the relative caretaker was no longer willing to have W.R. in her home. Due to her family circumstances and W.R.'s aggressive behavior, it was too stressful to continue to care for him. The juvenile court sustained the petition, and W.R. was placed in a foster home.

Two months later, before the six-month review hearing, the Bureau filed a report recommending that W.R. be returned to mother's care and that mother receive family maintenance services. Mother had completed parenting classes and was attending two women's support groups. She was also attending individual counseling. Her housing was stable, and her other son, W.R.'s five-year-old half brother, was in her care. In addition, visitation continued to be successful, and W.R. had started overnight visits with her.

The report was careful to note that if W.R. was returned to mother, the Bureau "recommend[ed] no in person, video[,] or phone contact with [father]," who remained in jail, "outside of the visitation arranged by the Bureau." Jail

3

records revealed that father had recently called and spoken to mother numerous times. In response, "the social worker developed a safety plan with mother" that included changing her phone number, continuing to attend therapy, and not permitting father to have contact with W.R.

At the September 2021 six-month review hearing, the juvenile court found that mother had received reasonable services and made "significant" progress in addressing the issues that led to W.R.'s removal. The court adopted the Bureau's recommendations and ordered that W.R. return to mother's care and that she receive family maintenance services.

A family-maintenance review hearing was held in April 2022. The Bureau's status report recommended that W.R. remain with mother and that a 12-month review hearing be set. Mother was employed and looking for new housing, and she was still attending her women's support groups and individual therapy. W.R.'s individual therapy, however, had been terminated for lack of attendance. The juvenile court adopted the Bureau's recommendations, and W.R. remained with mother.

Around the same time, father was convicted of assault with a deadly weapon and put on supervised release. In September 2022, in a memorandum accompanying a request to continue the 12-month review hearing, the Bureau reported that in late May, father had gone to mother's home and harassed her, prompting the paternal grandmother to call the police. Mother never reported this incident to the Bureau. In late July, father attempted to break into mother's home and then fled from the police, which mother reported to the Bureau about a week later. The social worker then "asked . . . mother [to] follow up with obtaining a restraining order" and provided her with various resources to do so, as well "a referral to the domestic violence liaison and parent partners for support."

Soon after mother reported the July 2022 incident to the Bureau, father approached mother and W.R. while they were on BART, and father followed them when mother tried to leave. Mother called the police, and father was arrested for stalking and spent the next month in jail. Mother obtained a temporary restraining order, and after father was released in late August the probation department issued a stay-away order requiring him to avoid contact with her. In addition, the social worker formulated a safety plan with mother under which mother agreed to call the police if father violated the stay-away order and to take other steps to avoid contact with him.

The Bureau concluded its memorandum by stating that it wanted "to recommend vacating the dependency and dismissing the petition," but it had "serious concerns regarding the circumstances that led to the three incidents [of] . . . police involvement" with father. Thus, the Bureau sought to continue the review hearing to verify that mother had a restraining order against father. The juvenile court granted the continuance and rescheduled the 12-month review hearing to October 2022.

A few days before that hearing was to occur, the Bureau filed a supplemental petition alleging under section 300, subdivision (b)(1), that W.R. remained at risk because mother had failed to comply with the case plan. Mother was no longer participating regularly in individual therapy and failed to ensure that W.R. attended counseling. Of more concern, mother had continuing contact with father. Despite the stay-away order, "father's ankle monitor pinged on/off" around mother's home, and father had been arrested for violating the order in late September. In addition, during an unannounced home visit in mid-October, father was in mother's home. As detailed in an accompanying memorandum, although the social worker saw father, mother repeatedly denied it was him and even had W.R. lie about

father's presence. Nor had mother verified that she had obtained a restraining order protecting W.R. from father. The Bureau recommended removing W.R. from mother and placing him in a foster home.

At a detention hearing in late October 2022, the juvenile court found there was a substantial danger to W.R.'s health requiring his removal from mother's care. W.R. was detained and placed in a foster home with his half brother, and the court ordered that mother receive one supervised visit per week.

A jurisdiction/disposition hearing was held in December 2022. The disposition report noted that mother now admitted that father had "frequent unapproved and unsupervised contact with [W.R.] . . . during this review period." She claimed that father "had changed his behaviors" and there was no more domestic violence, but the Bureau believed these statements "demonstrate[d] a lack of insight" given that "the police were called three times due to [father's] harassing, stalking, and breaking into the home." Mother also "continue[d] to fail in following through with enforcing the restraining order and adding [W.R.] on as a protected person," failed to follow the safety plan, and did not comply with the requirements that she and W.R. attend therapy. Thus, while mother "fe[lt] she [was] a great mother and wishe[d] to reunify with both of her children," the Bureau believed that "[t]he same conditions [were] still present as when this dependency began" and was "unable to recommend" further reunification services.

At the hearing, over mother's objection, the juvenile court found true the supplemental petition's allegations about mother's continued contact with father and her other failures to comply with the case plan. In contesting the Bureau's proposed disposition, mother presented a social worker's testimony that she was trying to obtain a restraining order, had started individual

6

therapy, and was on the waitlist for a domestic violence program. But the social worker also testified that mother had been unable to keep W.R. safe despite the safety plan and that the Bureau could not offer her more reunification services because the statutory period had run.

Mother argued that even though 18 months had passed, the juvenile court should find extraordinary circumstances existed to extend her reunification services "based upon [her] connection with [W.R.] . . . [and] based upon . . . [father's] re-entering the picture." The court declined to do so, explaining that "the really fundamental problem with this case is that [there was] little basis for expecting that [mother] will do what she says she's going to do." Mother had "consistently lied to . . . pretty much everybody involved in this case" and had repeatedly put W.R. at risk by letting father care for him. Because the court could not find any reason to believe that mother would end her relationship with father or comply with any plans or orders to keep W.R. safe, there was "no legal basis" for extending services. The court therefore terminated mother's services and set a section 366.26 hearing for April 6, 2023.

## II.
### DISCUSSION

Where, as here, a child was three years of age or older when first removed from a parent's physical custody, the parent "typically receive[s] up to 12 months of reunification services." (*Michael G. v. Superior Court* (2021) 69 Cal.App.5th 1133, 1141; § 361.5, subd. (a)(1)(A).) "The juvenile court may extend services up to 18 months . . . if it finds there is a substantial probability the child will be returned to the parent's custody within the extended time period, or if it finds reasonable services were not provided." (*Michael G.*, at p. 1141; §§ 361.5, subd. (a)(3)(A), 366.21, subd. (g)(1).) Generally, if the child is not returned to the parent's physical custody at the

18-month mark, the juvenile court must terminate services and set a section 366.26 hearing. (*Michael G.*, at p. 1141; § 366.22, subd. (a)(3); see § 366.22, subd. (b).)

Under section 352, "the [juvenile] court may continue any hearing . . . beyond the time limit within which the hearing is otherwise required to be held, provided that a continuance shall not be granted that is contrary to the interest of the minor." (§ 352, subd. (a)(1).) "Notwithstanding the[] statutory limits on reunification services" discussed above, "a juvenile court may invoke section 352 to extend . . . services beyond these limits if there are 'extraordinary circumstances which militate[] in favor of' such an extension. [Citations.] Extraordinary circumstances exist when 'inadequate services' are offered by the child welfare agency or 'an external force over which [the parent has] no control' prevented the parent from completing a case plan." (*In re D.N.* (2020) 56 Cal.App.5th 741, 762 (*D.N.*).)

Initially, we address the standard of review. Mother claims we should review for substantial evidence, stating that the juvenile court was required to find "by clear and convincing evidence [that] it would be detrimental to [W.R.] to return him to [her] custody . . . and there [were] no reasonable means to protect [his] physical health without moving him from parental custody." Although the court made such a finding at the December 2022 jurisdiction/disposition hearing (see § 361, subd. (c)(1)), that is not the ruling mother challenges. Rather, she challenges the court's failure to find extraordinary circumstances justifying a continuance of her reunification services, a ruling we review for an abuse of discretion. (See *D.N.*, *supra*, 56 Cal.App.5th at p. 756; *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, 1388.)

Mother claims that extraordinary circumstances justifying a continuance were present because under *D.N.*, "father was an uncontrollable external force." Father's behavior is not analogous to factors that *D.N.* and other decisions have found sufficient. In *D.N.*, "the only barrier to reunifying" was the father's ongoing lack of housing despite repeated attempts to secure it, and the Court of Appeal concluded that "the lack of readily accessible affordable housing" was an uncontrollable external force. (*D.N.*, *supra*, 56 Cal.App.5th at pp. 763, 765.) Similarly, in *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, the mother was unable to comply with the case plan solely because she was hospitalized for most of the reunification period. (*Id.* at pp. 1777–1778.)

Here, in contrast, mother's failure to comply with the case plan was due to factors within her control. She was not faulted merely for having contact with father. Rather, though she initially attempted to avoid him, she later allowed him in her home and let him care for W.R. Moreover, she repeatedly lied about doing so, justifying the juvenile court's conclusion that she could not be trusted to fulfill her promises to get back on track. It may have been difficult for mother to keep away from father when he was out of custody, but her choices, not his, resulted in termination of her services.

Providing reunification services past the statutory period may also be justified where a parent received inadequate services. (*D.N.*, *supra*, 56 Cal.App.5th at p. 762; *In re M.S.* (2019) 41 Cal.App.5th 568, 594–595 [discussing cases].) Mother does not explicitly claim that she received inadequate services, but she argues that "[t]he [juvenile] court could have solved the problem by placing [her] and [W.R.] in a restrictive domestic violence center . . . where [she] would be closely monitored by the center as well as the Bureau. That way [she] would be able to obtain the necessary

9

support she needed and presumably be able to transition into a safe environment for both her and the child. [She] had engaged in many beneficial programs and just needed more rigorous support, most particularly . . . when . . . father was out of custody."

We agree with the Bureau that mother forfeited any challenge to the reasonableness of her services by failing to raise the issue below. (See *In re F.P.* (2021) 61 Cal.App.5th 966, 974.) Moreover, mother cites no authority suggesting the services she received were inadequate because they did not include the "more rigorous support" she speculates would have "solved the problem." In deciding whether services are reasonable, " '[t]he standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) Mother fails to demonstrate that her services were so inadequate that the juvenile court abused its discretion by declining to extend them.

### III.
### DISPOSITION

The petition for extraordinary writ relief is denied on the merits. (Cal. Rules of Court, rule 8.452(h)(1); see § 366.26, subd. (*l*).) Mother's request for a stay of the section 366.26 hearing scheduled for April 6, 2023, is denied as moot. This decision shall be final immediately in the interests of justice. (Cal. Rules of Court, rules 8.452(i), 8.490(b)(2)(A).)

10

_____

Humes, P.J.

WE CONCUR:


_____

Margulies, J.


_____

Banke, J.


_D.M. v. Superior Court_  A166764

11