Filed 5/8/25  In re Camila M.R. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re CAMILA M.R., a Person Coming Under the Juvenile Court Law. | B333565 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 22CCJP00921A) |
| Plaintiff and Respondent, | |
| v. | |
| JUAN M. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Pete R. Navarro, Commissioner.  Affirmed.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant Nancy R.

John M. Kennedy, under appointment by the Court of Appeal, for Defendant and Appellant Juan M.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Nancy R. (Mother) and Juan M. (Father), the parents of minor Camila, appeal from the juvenile court's order terminating Mother's reunification services at the 12-month review hearing. Mother contends the court abused its discretion when it terminated her reunification services because she was complying with her case plan and continued services would be in Camila's best interests. Father filed a separate brief joining in Mother's arguments. We conclude the court did not abuse its discretion when it terminated Mother's reunification services. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Initial referral and petition

In late October 2021, the Orange County Social Services Agency/Children and Family Services (OCSSA) received a report that Mother suffered panic attacks while holding Camila, causing her to drop the child on multiple occasions. According to the reporting party, Mother also expressed suicidal ideations, once while holding a knife and caring for Camila.

Father and several of Camila's other relatives confirmed that Mother had been hospitalized multiple times because of her mental health issues. The relatives were concerned about Camila's safety while alone in Mother's care. Nevertheless, Father believed Mother was overmedicated and only needed "vitamins" to treat her mental health issues.

2

A pediatrician who examined Camila in late October 2021 reported that Mother appeared "to be severely schizophrenic, withdrawn and spaced out or slow functioning, and almost to the [point] of being catatonic." The pediatrician was concerned about Camila's well-being in her parents' care.

On November 2, 2021, the OCSSA filed a dependency petition under Welfare and Institutions Code section 300, subdivision (b). The petition alleged there was a substantial risk that Camila would suffer serious physical harm because, among other things, Mother had a panic attack while caring for the child, Mother had unresolved mental health issues and lacked insight on how to appropriately ensure Camila's safety, and Father was aware of Mother's unresolved mental health issues but was unable to ensure Camila's safety while in Mother's custody. The juvenile court detained Camila from her parents' custody and found Father was Camila's presumed parent.

## II.    Jurisdiction

In early November 2021, OCSSA interviewed Mother and Father. Mother was "withdrawn," her speech was slow, her words were slurred, she often lost her train of thought, and she sometimes did not comprehend the social worker's questions. Mother started taking medication when she was 12 years old, but she stopped taking it about three months before the family came to the agency's attention. Mother believed she was "over medicated" and no longer needed to take medication.

According to Father, Mother's behavior improved after she stopped taking medication, but she could not be left alone. Nevertheless, Father was not concerned about Camila's safety around Mother.

3

When asked about the petition's allegations, the parents denied that Mother ever dropped Camila. Mother claimed that when she has panic attacks, she always puts Camila in her crib or bouncer until she (Mother) calms down. Mother and Father also denied that Mother ever threatened to kill herself while holding a knife. The parents claimed that Mother's relatives lied about Mother dropping Camila and threatening to kill herself because they do not like Mother and "would do anything to get her in trouble."

In late November 2021, a social worker recommended that Mother begin taking her medication again. The parents obtained Mother's medication the next day.

In early December 2021, Father reported that he had to call 9-1-1 because Mother was " 'very sick.' " Mother was "shaking uncontrollably and experiencing abnormal tongue movements." Mother was hospitalized and placed on a "5250 hold." Mother was diagnosed with "Schizoaffective Disorder with catatonic features." During her hospitalization, Mother was withdrawn, anxious, and depressed, and she experienced "command auditory hallucinations" directing her to "kill [her]self."

Mother was released from the psychiatric facility in early January 2022. According to Father, Mother's behavior had improved, and she was attending daily counseling sessions. Mother returned to the facility a few days later, however, after she experienced auditory hallucinations telling her to do " 'bad things.' " Mother asked Father to return her to the facility because she was afraid that she would hurt herself.

As of early January 2022, Mother and Father were visiting Camila for only three of their allotted 10 hours each weekend. During her visits, Mother shook uncontrollably, often had a "flat

4

affect," and spoke "in a dull flat voice with no expression or emotions." Mother did not interact much with Camila, including refusing to hold or feed the child, and she could not change the child's diaper. Camila was fussy and would cry after visits with her parents.

In early February 2022, Camila's caregiver reported that Mother did not speak to Camila during virtual visits. Mother often made noises, like a humming sound, for several minutes.

On March 4, 2022, the court held a jurisdictional hearing. Mother and Father pled no contest to the petition.

## III. Disposition

On March 18, 2022, Camila's case was transferred to Los Angeles County. The Los Angeles County Department of Children and Family Services (Department) interviewed Mother and Father. Mother was "withdrawn, spaced out or slow functioning, and almost catatonic." Mother stated that she would stop attending therapy once Camila was returned to her custody and that she planned to stop taking her medication because she "felt better."

Father believed Mother was "doing much better" and that they were ready for Camila to return to their custody. According to Father, Mother would be the child's primary caregiver when he went to work. Aside from asking his siblings for help, Father did not have a safety plan if Mother experienced a "crisis" while caring for Camila.

The quality of Mother's visits with Camila had yet to improve. Mother did not interact or communicate with the child. According to Camila's caregiver, Mother often was " 'not there' " during visits. Mother still could not change Camila's diaper. During one visit, Mother and Camila fell asleep together, but

5

Mother did not wake up when the child did. Father was very involved and would do "everything for Camila" during their visits.

As of mid-May 2022, Mother was attending an intensive outpatient program at a psychiatric facility three days per week. Mother participated in group therapy and case management services. The group therapy focused on coping skills, relapse prevention, symptom management, community reintegration, cognitive behavioral therapy, medication management, life skills, and healthy living.

As of late June 2022, Mother no longer participated in individual counseling. Her services were terminated because she missed several sessions and no longer lived in Orange County.

During a visit in late June or early July 2022, Mother tried to bathe Camila. When soap got into the child's eyes, Mother used too much water to try to remove it. The monitor had to intervene and explain to Mother that she could drown Camila if she was not careful. When not interacting with Camila, Mother often "zone[d] out."

On August 15, 2022, the court held a dispositional hearing. The court declared Camila a dependent of the court, removed her from Mother's and Father's custody, and awarded the parents reunification services. The court ordered Mother to complete a developmentally appropriate parenting program, parent-child interactive therapy, and individual counseling focusing on past trauma, parenting, anxiety, and developmental milestones. The court also ordered Mother to take her prescribed psychotropic medications and to comply with all mental health services.

## IV.    The six-month review hearing

In August and September 2022, Mother underwent psychological evaluations through the Regional Center.  Mother tried her best to answer questions during her evaluations, but she struggled to understand certain concepts and needed time to process information.  Mother was diagnosed with mild intellectual developmental disorder.

In October 2022, Mother began attending individual counseling sessions online through the West Advisory Christian Counseling Center.  As of early November 2022, Mother had attended five counseling sessions.

In January 2023, Camila was diagnosed with Autism Spectrum Disorder, with accompanying language impairment.  Camila had frequent temper tantrums and difficulty adjusting to changes in her routines, and she no longer interacted with other children.

As of early January 2023, Mother's and Father's visits with Camila were going well, and the child enjoyed being around her parents.  Mother and Father were visiting with Camila for nearly eight hours at their home on Saturdays and for five hours at the mall on Sundays.  Mother was able to change Camila's diapers and feed the child.  Mother played with Camila, and the child often followed her around the parents' house.  Mother was not very talkative, however, and she often responded to questions with simple words.

In mid-January, Mother and Father began having overnight visits with Camila on the weekend.  Mother and Father knew that Mother could not stay home alone with Camila.

As of February 2023, Mother completed a parenting program and was still attending weekly individual counseling

sessions. Mother could not enroll in parent-child individual therapy because no local agencies offered the service. Mother claimed that she met with her psychiatrist every month and was taking her medications daily. The Department could not confirm that Mother was regularly meeting with her psychiatrist, however, because Mother did not consent to her psychiatrist disclosing information about her treatment. The Department asked Mother to authorize her psychiatrist to release such information.

Camila was well-adjusted in her caregivers' home. She ate well, enjoyed taking baths, and slept through the night.

In its February 2023 status review report, the Department recommended releasing Camila to Father's custody once Father obtained a driver's license and on the condition that the child not be left alone with Mother. Although Mother was complying with her case plan and her mental health issues appeared more stable, the Department was concerned about her ability to care for Camila on her own.

On February 14, 2023, the court issued an order releasing Camila to Father's custody for a one-month "extended visit." The court ordered Father not to leave Camila alone with Mother. Later that day, Father informed the Department that he did not have a childcare plan for Camila and that he could not take Camila to a daycare center when he went to work because he did not have a driver's license.

On March 16, 2023, the court held the six-month review hearing. The court found that returning Camila to her parents' custody would create a substantial risk of detriment to the child's safety or well-being. The court found Father was substantially complying with his case plan and that Camila was likely to be

returned to his custody by the 12-month review hearing. The court continued reunification services for another six months.

## V.    The Department's modification petitions

In April 2023, the West Advisory Christian Counseling Center terminated Mother's individual counseling program because she missed more than three therapy sessions. As of that date, Mother completed 22 therapy sessions, while missing five sessions. Mother "openly discussed her thoughts and feelings" during her therapy sessions, and she "participated in activities that provided insight to her emotional reactivity and how that impacted her relationship with others."

On June 17, 2023, Mother asked Father to take her to the hospital. Father refused to do so because he believed Mother was "doing well" and "only vomiting." Father thought Mother's behavior had changed because she was adjusting to a new medication. The next day after taking Camila back to her caregivers' home, Father noticed that Mother was acting " 'strange.' " She was "withdrawn and was laughing for no reason." Father called 9-1-1 after Mother again asked him to take her to the hospital.

On June 27, 2023, hospital staff confirmed that Mother was diagnosed with schizoaffective disorder and taking four types of medication. According to the staff, Mother "ha[d] good days and bad days." Mother was sometimes tearful and would start screaming and yelling for no reason.

The hospital's social worker reported that Mother was "not doing well." Mother told the social worker that she suffers frequent panic attacks and auditory hallucinations instructing her to kill herself. Although Mother could not remember why she

9

was hospitalized, she told the social worker that she was " 'stabbing the countertop with a knife.' "

According to the hospital's social worker, Mother attacked a nurse while the nurse was trying to administer Mother's medication. Mother grabbed the nurse by the hair, and other staff members had to intervene before Mother let the nurse go. Mother also scratched her name and the words " 'slut' " and " 'whore' " on a hospital window. Father accused the hospital's staff of "lying" about Mother's condition and behavior.

In July 2023, the Department petitioned for an order returning Father to monitored visits with Camila and prohibiting him from monitoring Mother's visits. The court granted the Department's petitions, suspending Father's overnight visits if Mother is in the home, prohibiting Father from monitoring Mother's visits, and ordering Mother not to be present during Father's unmonitored visits.

## VI.   The 12-month review hearing

In late July 2023, the Department conducted an unannounced visit at Father's house. Father was worried because Mother was not home or answering her phone. Mother was later found at a hospital, where she was admitted after "displaying 'some behaviors.' " Mother was admitted to the hospital for suicidal ideation with a plan to overdose on medication.

According to Father, Mother had difficulty obtaining her medications from the pharmacist, and she had been without her medication for about one week. The Department's social worker told Father that he needed to be more informed about Mother's treatments. Father responded that he only knew that Mother

10

was in " 'many therapies.' " According to Father, Mother could no longer care for herself.

On August 8, 2023, a hospital nurse reported that Mother was "restless, withdrawn and stays in her room." Mother continued to experience auditory hallucinations instructing her to " 'end [her] life.' " Mother was taking her medications at the hospital.

On August 16, 2023, the hospital's social worker reported that Mother was continuing to take her medications and her behavior had improved. Mother was "calm, cooperative, withdrawn, isolative," and she appeared "depressed." Mother did not have any recent behavioral outbursts, and she denied having more auditory hallucinations or suicidal ideations.

On August 25, 2023, the hospital discharged Mother. She agreed to continue mental health treatment after her release.

By September 2023, Mother was visiting Camila for two hours a week at the mall. Mother's interactions with Camila were limited, and she needed help changing the child's diapers. Mother showed "no affection" toward the child, and she had "to be told exactly what to do with Camila." According to the caregiver, Camila appeared to be "under stress" during her visits with Mother.

As of September 26, 2023, Mother attended an outpatient program in Los Angeles County four days a week. Mother received treatment from a psychiatrist, but she had yet to authorize the psychiatrist to release any information about that treatment. Mother refused to receive medication in Los Angeles County because she wanted to obtain it from a facility in Orange County.

The court held the 12-month review hearing on September 27, 2023. The court found by a preponderance of the evidence that returning Camila to her parents' custody would create a substantial risk of detriment to her safety, protection, or physical and emotional well-being, and it found by clear and convincing evidence that the Department made reasonable efforts to return Camila to her parents' custody. The court continued Father's reunification services for an additional six months, finding that he was complying with his case plan and that Camila was likely to be returned to his custody by the 18-month review hearing. The court did not continue Mother's reunification services, finding that she was not "in the same place [as Father] because of her recurring psychiatric issues," which continued to prevent her from being able to safely care for Camila.

Mother and Father appeal.

## DISCUSSION

Mother contends the court abused its discretion when it terminated her reunification services at the 12-month review hearing. Father filed a separate brief joining in Mother's arguments. As we explain, the court did not abuse its discretion when it terminated Mother's reunification services at the 12-month review hearing.

At the 12-month review hearing, the court must return a child to her parent "unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (Welf. & Inst. Code, § 366.21, subd. (f)(1).) If the child is not returned to the parents' custody at the 12-month review

12

hearing, the court may "continue reunification services for up to six months, provided the next review hearing occurs within 18 months of the date on which the child was physically removed from parental custody." (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 564 (*Alanna A.*).)

If the court decides to continue reunification services beyond the 12-month review period for one parent, it has discretion to terminate reunification services for the other parent if he or she is not complying with his or her case plan or making adequate progress reunifying with the child and continued services to that parent would not be in the child's best interests. (*Alanna A.*, *supra*, 135 Cal.App.5th at p. 365.) In exercising its discretion, "the court has 'the ability to evaluate whether the parent will utilize additional services and whether those services would ultimately inure to the benefit of the minor.' " (*In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.) The parent seeking additional services has the burden to show such an order would be in the child's best interests. (*Ibid.*)

We review the juvenile court's decision to terminate a parent's reunification services at the 12-month review hearing for abuse of discretion. (*Alanna A.*, *supra*, 135 Cal.App.5th at p. 366.) We review the court's factual findings supporting its decision to terminate reunification services for substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.)

The record supports a finding that Mother was not complying with her case plan. At the dispositional hearing, the court ordered Mother to complete individual counseling, take all prescribed psychotropic medications, and comply with all mental health services. Although Mother completed many individual

13

counseling sessions, she ultimately was kicked out of her counseling program for poor attendance, and she never reenrolled in that program or completed a different program. In addition, Mother was refusing to receive her medication by the time of the 12-month review hearing because she wanted her prescriptions filled in Orange County. Mother also never consented to her psychiatrist disclosing information about her treatment, preventing the Department and the court from meaningfully evaluating her progress in her mental health services.

Importantly, Mother did not make substantial progress resolving the issues that led to Camila's dependency. Camila was removed from her parents' custody and later declared a dependent of the court because of Mother's unresolved mental health issues. The events that led to Camila's dependency included Mother experiencing auditory hallucinations directing her to kill herself and her inability to care for Camila on her own. In the three months leading up to the 12-month review hearing, Mother was twice hospitalized for experiencing suicidal ideations and auditory hallucinations directing her to kill herself. In addition, by the time of the 12-month review hearing, Mother had yet to show that Camila would be safe in her care. Mother could not attend to Camila's basic needs and needed constant direction while watching Camila during their visits.

For similar reasons, Mother did not show that continuing her reunification services would be in Camila's best interests. By the time of the 12-month review hearing, Mother's interactions with Camila were limited, and she showed "no affection" for the child. Camila also appeared to be "under stress" when she visited with Mother. Mother still needed help changing Camila's

14

diapers, and she had to be told "exactly what to do" when she was around the child.

Mother contends "extraordinary circumstances" warranted extending her reunification services beyond the 12-month review hearing. Citing *Andrea L. v. Superior Court* (1998) 64 Cal.App.4th 1377, Mother argues that her "mental health issues and hospitalizations . . . were clearly out of her control" and prevented her from making more progress toward reunifying with Camila. (See *id.* at p. 1388 [noting that unexpected hospitalization at critical stage of proceedings may warrant extending reunification services where the parent otherwise worked hard toward completing her case plan].) We are not persuaded. Mother's hospitalizations throughout the reunification period in this case were not unexpected or extraordinary. Rather, as we just explained, they were a continuation of the issues leading to Camila's dependency, and they demonstrate that those issues had yet to be resolved by the time of the 12-month review hearing.

## DISPOSITION

The juvenile court's order terminating Mother's reunification services is affirmed.

VIRAMONTES, J.

WE CONCUR:

STRATTON, P. J.

GRIMES, J.

15